UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA;<br>STATE OF FLORIDA; and<br>STATE OF TENNESSEE<br>*EX REL.* JACQUELINE CUSHING<br><br>PLAINTIFFS,<br><br>v.<br><br>TOMOKA MEDICAL LAB, INC; RAJEN<br>SHAH; GOLDEN RULE MANAGEMENT;<br>SPRINGS MEDICAL LAB LLC; TENNESSEE<br>VALLEY REGIONAL LABS; and CRESCENT<br>LABS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.<br>8:19 cv 2997 T33 TGW<br><br>**FILED IN CAMERA & UNDER**<br>**SEAL**<br>**(AS REQUIRED BY 31 U.S.C. §**<br>**3730(b)(2))** |

## *QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL

1.      Relator, Jacqueline Cushing, brings this action on behalf of the United States, the

State of Florida, and the State of Tennessee against Tomoka Medical Lab, Inc.; Rajen Shah;

Golden Rule Management; Springs Medical Lab LLC; Tennessee Valley Regional Labs; and

Crescent Labs (collectively referred to herein as "Defendants") under the Federal False Claims

Act, 31 U.S.C. §§ 3729 *et. seq.* (the "FCA") and the respective state false claims acts and alleges

the following:

2

## OVERVIEW

2.      Defendant Rajen Shah is defrauding Medicare, Medicaid and other government healthcare programs through the Defendant laboratories he owns and operates by engaging in practices including but not limited to: performing and billing for expensive molecular tests that were never ordered by a licensed provider; unbundling CPT codes to improperly inflate reimbursement; and failing to return known overpayments received from government healthcare programs. In furtherance of this systemic, fraudulent scheme, Shah is concealing his ownership interest in his laboratories and is falsifying NPI data submitted to government payors. In addition, several of Defendants' practices are threatening the well-being of patients and the accuracy of the laboratory test results.

3.      The fraudulent scheme has been implemented at the Defendant laboratories on a systemwide basis in multiple states. Shah intentionally trained his staff at the various lab locations to routinely cause a more expensive and complex molecular genetic test to be performed and billed instead of the actual test ordered by the physicians, which was a less expensive, standard urinalysis with culture and sensitivity. Despite the actual test ordered by the physicians, Defendants intentionally manipulated the system to cause government payors to pay for a more expensive, molecular test referred to as a "UTI ID" or "PCR" test. A routine urinalysis with culture and sensitivity if indicated typically results in approximately a $4 to $13 reimbursement from Medicare, while the molecular "UTI ID" test performed by Defendants due to the number of units Defendants routinely bill results in approximately a $500 reimbursement.

4.      Defendant Shah boasted to Relator that he had programmed the computer system to associate certain diagnoses with patients' claims to ostensibly justify the tests that Defendants

were performing even though the treating physicians had not listed those diagnoses and had never ordered the more expensive tests.

5.      Defendants' computer systems generated bills that purposely and illegally unbundled CPT codes in order to increase Defendants' reimbursement for laboratory tests on blood and urine specimens. In more than one instance, Medicare and Medicaid notified Defendants of overpayments caused by improper coding and billing practices, such as unbundling, but Defendants failed to refund those overpayments to the government or correct the internal practices that caused the routine overbilling of government payors.

6.      A significant portion of Defendants' patients are government healthcare beneficiaries. Therefore, Defendants' fraudulent practices have caused and continue to cause substantial damages to government healthcare programs while simultaneously creating patient safety issues.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345, 28 U.S.C. §1331, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

8.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over the Relator's state law claims as those claims and the Relator's federal law claims are sufficiently related to form part of the same case or controversy under Article III of the United States Constitution. This Court has supplemental jurisdiction over the Relator's state law claims pursuant to 31 U.S.C. § 3732(b), as the state law claims arise from the same transactions and occurrences as the federal action.

9.     This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found in, resides in, transacts business in, or has committed acts related to the allegations in this Complaint in the Middle District of Florida.

10.     Venue is proper pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c) because at least one of the Defendants can be found in, resides in, or transacts business in the Middle District of Florida and because violations of 31 U.S.C. § 3729 discussed herein occurred in this judicial district.

## PARTIES

11.     Relator, Jacqueline Cushing, resides in Florida and has worked in a management role for various healthcare providers for the past 25 years. She was hired by Defendant Rajen Shah as the operations manager for Defendant Tomoka Medical Lab, where she worked from August 8, 2019 to October 1, 2019. Although her tenure was short, while employed by Defendant Tomoka Medical Lab, Relator observed and personally learned about the fraudulent scheme set forth herein. Relator is an original source as defined by the False Claim Act and she has made voluntary disclosures to the government prior to the filing of this lawsuit.

12.     Defendant Rajen Shah is a businessman residing in Owensboro, Kentucky who owns and operates the Defendant laboratories located in Florida, Kentucky, Tennessee and Alabama.

13.     Defendant Tomoka Medical Lab, Inc. (NPI 1700819794), 783 S. Nova Rd., Ormond Beach, FL 32174 was purchased by Defendant Shah in June of 2019. Despite this purchase, it appears that Defendant Shah continues to use the NPI and tax ID numbers of the previous owner.

14.      Defendant Springs Medical Lab LLC (NPI 1417193343) is located in Owensboro, KY and Gadsden, Alabama.

15.      Defendant Golden Rule Management (NPI 1396166203) is located in Owensboro, KY and appears to be the parent company of Defendant Springs Medical Lab LLC.

16.      Defendant Tennessee Valley Regional Lab d/b/a Crescent Labs (NPI 1164850293) is located in Knoxville, TN.

## REGULATORY BACKGROUND

### Laboratory tests must be ordered by a licensed provider to be eligible for Medicare reimbursement.

17.      Medicare coverage extends to tests ordered by a licensed provider, such as a physician or nurse practitioner.

18.      The physician or other eligible professional who is treating the beneficiary must order diagnostic laboratory tests. Tests not ordered by the treating physician or eligible professionals are not considered reasonable and necessary and should not be billed to any government payor. 42 C.F.R. § 410.32(a).

19.      The diagnosis used to order tests for a government beneficiary should be documented and illustrate why the patient needs the specific test ordered, as opposed to just listing a generic ICD-10 code.

20.      With regard to claims for diagnostic laboratory tests, the "entity submitting the claim must maintain the following documentation: (A) The documentation that it receives from the ordering physician or nonphysician practitioner. (B) The documentation that the information that it submitted with the claim accurately reflects the information it received from the ordering physician or nonphysician practitioner." 42 C.F.R. § 410.32(d)(2)(ii).

6

### Molecular diagnostic testing terms

21.     PCR stands for polymerase chain reaction and is a technique used to amplify trace amounts of DNA or RNA. PCR tests are used to help diagnose genetic diseases and detect pathogenic organisms that are difficult to cultivate, such as HIV.

22.     A UTI ID test is a comprehensive panel which uses molecular genetic / PCR testing to detect urinary pathogens.

### FACTUAL ALLEGATIONS

23.     Relator began working for Defendant Tomoka Medical Lab on August 8, 2019 as the lab's operations manager. Defendant Shah came to the Tomoka lab for four days to provide Relator with in-person training. During the four-day training session, Defendant Shah instructed Relator regarding Shah's laboratories' policies and procedures. Relator soon realized that several of the practices Shah described were designed to greatly increase Defendants' profits by defrauding government healthcare programs. After several weeks of working at the laboratory and having direct and unfettered access to the information in the lab's computer systems, Relator personally observed evidence of Defendants' numerous fraudulent practices, including performing tests without the necessary treating physicians' orders and unbundling CPT codes to inflate Medicare and/or Medicaid reimbursement as described in further detail below.

### Defendants are performing and billing for laboratory tests that were not ordered by a physician or other licensed provider.

24.     During her four-day training session, Defendant Shah instructed and required Relator to enter the code for a molecular test each time a physician ordered a standard urinalysis with culture and sensitivity. This internal code for the molecular test was entered by Defendants by using the letters "UTI ID" because these letters corresponded to the name that Defendants' reference laboratory (Solaris Diagnostics) used to refer to its molecular test panel for detecting

urinary pathogens. Relator discovered that each time this code was entered into the computer system, it caused a requisition to be sent electronically to Solaris Diagnostics instructing the molecular testing laboratory to perform a more expensive and complex molecular test on the urine specimen even though the doctor had only ordered a standard urinalysis with culture and sensitivity.

25.     Defendants receive approximately $500 from Medicare for each molecular UTI ID / PCR test they send to Solaris as opposed to approximately $4 to $13 for a standard urinalysis with culture and sensitivity. Relator observed that Defendants' Tomoka Lab location alone was sending approximately 10 to 15 urine specimens a day to Solaris to perform UTI ID molecular tests on the specimens.

26.     Defendant Shah was adamant that every physician's order that requested a urinalysis with culture and sensitivity be improperly converted to a UTI ID. On one occasion, Relator witnessed Shah become very upset with employees who had tried to correctly enter the physician's order into the computer system as a urinalysis with culture and sensitivity, as opposed to a UTI ID. Shah ordered the employees to always enter UTI ID whenever they saw an order for a urinalysis with culture and sensitivity, despite the fact that the physician's order did not request the more expensive, molecular test.

27.     Defendant Shah bragged to Relator that he had overhauled the Tomoka computer systems when he purchased the company. Specifically, he explained that he hard-wired an internal "99 code" to search for diagnoses that could be associated with claims to make it appear as though the tests being performed were supported by legitimate diagnoses despite the fact that a licensed provider had never intended to order the test that was billed to the government. Shah

8

repeated this explanation to Relator on multiple occasions. Defendants used this fraudulent technique to associate improper diagnoses with claims for lab tests other than the UTI ID as well.

28.     Defendant Shah also told Relator that the billing services for his laboratories are being performed by a foreign company located in India. Relator was told the Indian billing partner received 5% of Defendants' collections as a fee for processing the inflated billing amounts generated by Defendants and submitted to government payors.

29.     As part of her duties as the operations manager, Relator had access to patient medical records and Defendants' computer systems, including the Defendants' LABDAQ Laboratory Information System. When Relator began reviewing copies of the actual orders generated by the treating physicians, the lab requisitions, and the claims information, she confirmed that UTI ID molecular tests were routinely being performed without an order from a licensed provider and thereafter billed to government payors.

30.     Even though the laboratory billings are outsourced to an entity in India, Relator did gain access in the scope of her duties to claims information for certain patients and was able to determine that a CPT code that was associated with the UTI ID test was CPT code 87798. This code is described as "infectious agent detection by nucleic acid (DNA or RNA), not otherwise specified; amplified probe technique, each organism." 87798 is not the CPT code that corresponds to a urinalysis with culture and sensitivity. Defendants charged approximately $1,000 each time they billed CPT code 87798 and fraudulently received approximately $500 in reimbursement from Medicare.

31.     Relator observed a CMS 1500 claim form dated September 5, 2019 submitted by Defendant Tomoka Medical Lab to Florida Medicaid for molecular testing services performed for Patient A on July 15, 2019. Defendants fraudulently billed CPT code 87798 (13 units) even

though the actual order from the treating physician specified that, with regard to the urine specimen, only a urinalysis with culture and sensitivity should have been performed. Defendants listed the following CPT codes pertaining to testing on the urine specimen: 87797, 81000, 87481, 87653, 87640 and 87081. The total charges listed on the claim form for these CPT codes equaled $1,253.18. The total reimbursement amount for these CPT codes, if paid at Medicare rates, would be approximately $635. The total reimbursement for only a standard urinalysis with culture and sensitivity would have been approximately $13. Furthermore, the diagnosis code D81.819 (biotin-dependent carboxylase deficiency) was fraudulently listed on the claim form even though it was not listed on the treating physician's orders. This represents a covert, apparent attempt to deceptively justify the molecular test to unsuspecting government payors.

32.     Relator reviewed information regarding a Medicare Part B claim for services performed for Patient B on June 27, 2019. A UTI ID molecular test had been performed even though a urinalysis with culture and sensitivity had, in fact, been ordered by the patient's treating physician.  This claim appears to have been reimbursed by Medicare because on September 27, 2019, CMS through First Coast Service Options sent Defendant Tomoka a letter requesting repayment of an $11.15 overpayment made in connection with services provided to Patient B on June 27, 2019. Based on the other records and overpayment letters she had reviewed, Relator was able to determine that the overpayment identified by Medicare with regard to Patient B was most likely due to a different problem, such as the unbundling issue discussed below. Because Defendants' scheme concealed their fraud with regard to the molecular testing, Medicare appears to not have been able to detect Defendants' improper billing for the UTI ID molecular test.

33.     Defendants submitted a Medicare Part C claim for services performed for Patient C on June 25, 2019. The treating physician had requested a urinalysis and urine culture and

specifically listed "CPT 87088" on the order form. Nevertheless, rather than performing the less expensive test (CPT code 87088) that the doctor actually ordered, Defendants directed its reference laboratory to perform the more expensive UTI ID molecular test. Defendants then billed Medicare for the more expensive test.

34.     Several doctors who received the unexpected PCR / UTI ID test results contacted Defendant Tomoka Medical Lab because they did not understand why they were receiving a long report with extraneous information when they had only ordered a standard urinalysis with culture and sensitivity. Relator was not surprised that the doctors were confused, especially since Relator had learned, based on her extensive, past experience working in the healthcare field, that the type of molecular test initiated and billed by Defendants is not routinely ordered.  Relator's understanding was that the molecular test was used in connection with higher risk patients, such as those who have cancer or HIV.

35.     Defendants instructed staff to tell the doctors who questioned the test results that the UTI ID is actually a better and more efficient test for measuring what they had ordered. The staff did not inform the doctors that the molecular tests required a different order. Doctors also were not told the molecular tests were more expensive than the tests ordered by the treating physicians who had examined the patients. Relator believed this to be a misrepresentation to the doctors because the doctors had, in fact, not ordered the molecular test that the Defendants caused to be performed and billed to the government.

36.     Several weeks after Relator began working at Defendant Tomoka Medical Lab, she heard that Solaris no longer wanted to perform testing for Defendants due to the fact that Defendants were behind in their payments to Solaris. After Solaris terminated its relationship with Defendants, Defendants were temporarily left without a molecular testing reference lab to

perform UTI ID/ PCR tests. During this brief time period while Defendant Shah searched for another molecular testing lab, Defendants sent their urine specimens to American Esoteric Laboratories (AEL) which is not a molecular / PCR testing lab like Solaris. AEL performed urinalysis and culture and sensitivity tests on the urine specimens Defendants sent to AEL as opposed to the more expensive molecular tests. During this time when Defendants were forced to order the proper tests that the treating physicians actually ordered, Relator was not aware of any complaints from any of the ordering physicians regarding the absence of molecular PCR testing, which she took as further confirmation that the physicians had never intended to order the more expensive, molecular PCR tests to begin with.

37.     It was not long before Defendant Shah found another molecular testing laboratory, Accu Reference Medical Lab, to perform the molecular tests for his laboratories. After a few weeks, however, Brandy Nose, the manager of Defendants' lab in Alabama, told Relator that Accu Reference was overwhelmed by the unusually large volume of molecular UTI tests being ordered by Defendants and that it no longer wished to do business with Defendants. Shortly thereafter, Defendant Shah terminated Relator's employment because she confronted him regarding his numerous fraudulent and unethical practices. At the time Relator was fired, Defendant Shah was in the process of finding another molecular testing lab to do business with. Therefore, Relator believes that Defendant Shah continues to carry out his fraudulent scheme to this day.

38.     Tests not ordered by the treating physician are not considered reasonable and necessary under Medicare and should not be billed to any government payor. Therefore, every time Defendants performed a PCR / UTI ID without a licensed provider's valid order, they

12

performed a medically unnecessary test which was not legally eligible for reimbursement under government healthcare programs, such as Medicare and Medicaid.

### Defendants are unbundling CPT codes for laboratory tests to inflate reimbursement.

39.     The UTI ID tests were not only performed without a licensed provider's order, but also were billed improperly and for excessive amounts in an unbundled fashion to increase reimbursement. Defendants unbundled CPT codes in connection with other types of lab tests in addition to UTI ID molecular tests. This second layer of fraud exacerbated damages to the government.

40.     On August 27, 2019, Defendant Tomoka Medical Lab sought reimbursement from the Florida Medicaid program on a CMS 1500 form for services performed on June 18, 2019 for Patient D using the following unbundled CPT codes: 82040, 82247,82310, 82374,82435, 82565, 82947, 84075, 84132, 841255, 84460, 84450, and 84520. All of the individual blood tests corresponding to these codes should be encompassed in a comprehensive metabolic panel (CPT code 80053).  Therefore, because Defendants performed a comprehensive metabolic panel, they should have instead billed the CPT code 80053 to represent the entire panel of bloodwork. Relator noted that the physician listed on the CMS 1500 form for this claim was Dr. Mark Gillespy. However, Dr. Rivera was the physician listed at the top of the order even though the order was never signed. This type of unbundling and false documentation occurred on a regular basis.

### Defendants have failed to return overpayments received from government healthcare programs.

41.     On occasion, Defendants received letters regarding overpayments that had been made to Defendants because of unbundled CPT codes associated with laboratory tests performed

13

on blood and/or urine specimens. Despite this fact, Defendants continued the unbundling scheme and submitted false claims to government payors knowing the claims were illegally unbundled.

42.     Some of the overpayment letters concerning the UTI molecular tests were sufficient in detail to identify the unbundling issue. However, none of the overpayment letters to Defendants that Relator reviewed actually identified the improper use of the molecular test itself or the absence of a valid order because Defendants' scheme made this key component of the fraud more difficult to detect. (As previously described, Defendant Shah programmed the computer system to falsify diagnoses which helped to conceal the fact that the tests were not medically necessary and were being performed without a valid physician's order.) For example, CMS sent Tomoka Medical Lab a letter on September 27, 2019 stating that there had been an overpayment made with regard to a Medicare Part B claim. When Relator located Patient B's information in Defendants' computer system and compared it with the physician's order, she saw that a UTI molecular test had been performed even though the order had requested a urinalysis with culture and sensitivity instead. The letter from CMS identified an $11.15 overpayment but did not identify the unauthorized use of the UTI molecular test or the absence of a valid physician's order.

43.     To Relator's knowledge, despite having knowledge of the frauds occurring on a daily basis, Defendants have made no efforts to refund the overpayments they received.

**Defendants are engaging in fraudulent practices on a systemwide basis.**

44.     After discussions with managers and staff from the other Defendant labs, Relator realized that the same fraudulent practices were occurring at other lab locations owned and/or operated by Defendants. For example, Brandy Nose, the manager of the lab in Alabama, provided training to Relator which involved discussions about the internal practice of ordering

PCR / UTI ID tests. When Relator asked Ms. Nose why she went along with Shah's practices in Alabama, Ms. Nose replied that Shah had "bought her a trailer and a car."

45.     Relator received further evidence that Defendant Shah implements the same improper practices systemwide during the time period, described above, when Shah was trying to find a molecular testing laboratory to replace Solaris Diagnostics. On September 3, 2019, Shah sent an email to all of the managers and client service representatives at all of his laboratories in Florida, Tennessee, Kentucky, and Alabama stating that "We are finalizing the agreement with new lab partner [Accu Reference Medical Lab] to perform our PCR testing. This lab processes over 100,000 per month. They are performing all of the tests that we need . . . We will be setting up the interface with them via LabDAQ. PCR testing has been an important part of our offering and do not want to compromise on testing and turn-around time."

46.     On September 12, 2019, Brandy Nose sent a follow-up email reminding all of the lab managers to use the code "6300" to inform Accu Reference to perform molecular UTI tests on specimens. As discussed previously, Accu Reference eventually was unable and/or unwilling to keep up with the unusually large volume of requisitions for molecular UTI tests on urine specimens coming from Defendants. Nevertheless, Defendant Shah was undeterred, and he began efforts to find yet another reference lab to perform PCR molecular testing for all of his laboratories so he could continue to carry out his fraudulent scheme.

47.     Relator's discussions with Tammy Pineda, the regional manager who works with Shah at Defendant Springs Medical Lab located in Owensboro, Kentucky, also confirmed that Shah's other laboratories were engaging in the same types of behavior set forth above. Every Tuesday, Ms. Pineda would conduct a phone conference with the different managers at all of the Defendant laboratories. During those phone conferences, the subject of UTI ID / PCR testing

was discussed on multiple occasions. The UTI ID testing fraud was a great source of revenue for Defendants to the detriment of the taxpayers of the United States and affected state Medicaid programs.

### Defendants' practices are harming patients and compromising the accuracy of their test results.

48.     Due to Defendant Shah's failure to pay the vendors who supplied his laboratories with essential materials, including reagents and quality controls, the Defendant laboratories were often unable to perform testing safely and accurately. The integrity of urine and blood samples was frequently compromised due to delays caused by a lack of these materials. Under these circumstances, patients often had to undergo repeat blood draws and/or urine collections because the original specimen had not undergone testing in a timely fashion. This put patients' health at risk and prolonged the time that patients had to wait in order to receive their test results and medical treatment.

49.     Defendants also failed to conduct the proficiency testing that is required to ensure that laboratories are performing testing in a safe and accurate manner. This absence of testing and safety oversight is detrimental to the safety of government beneficiaries.

50.     Relator became concerned about the patients' well-being and the numerous Clinical Laboratory Improvement Act (CLIA) violations that she observed at the laboratory. Other individuals became concerned as well, including the medical director of Defendant Tomoka Medical Lab, Dr. Edwin Sia, who eventually resigned on September 20, 2019.

### Defendant Shah is engaging in additional improper behaviors in furtherance of his fraudulent scheme.

51.     Defendant Shah is involved in suspicious activities that appear to be in furtherance of his fraudulent scheme. For example, despite Defendant Shah's purchase of

Tomoka Medical Lab in June of 2019, Shah continues to use the NPI and tax ID numbers of the previous lab's owner. Shah bragged to Relator that he had figured out a "special way" to transition ownership of a testing laboratory without having to interrupt operations which would otherwise be required to become recredentialed in accordance with the requirements under state and federal laws, including CLIA.

52.     The practices of Defendant Shah and his Defendant laboratories are causing the government to suffer damages and are threatening patient safety. A large percentage of Defendants' laboratory services are rendered to government healthcare program beneficiaries, especially Medicare patients. As set forth herein, Defendants' fraudulent practices have occurred and continue to occur on a system-wide basis.

## COUNT I

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

53.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

54.     Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

55.     The United States, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

56.     By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

17

## COUNT II

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

57.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

58.     Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

59.     The United States, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

60.     By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT III

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

61.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

62.     Defendants have knowingly avoided their obligation to return payments they have improperly received from government healthcare programs in violation of 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

63.     By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT IV

### Violations of the Florida False Claims Act
### Fla. Stat. Ann. § 68.081 et seq.

64.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

65.     Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

66.     Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

67.     Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state.

68.     The Florida Medicaid Program, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

69.     By reason of the payment made by the Florida Medicaid Program, as a result of Defendants' fraud, the State of Florida has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT V

**Violations of the Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. § 71-5-181 et seq.**

70.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

71.     Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval under the Tennessee Medicaid program.

72.     Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim under the Tennessee Medicaid program.

73.     Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Tennessee Medicaid program.

74.     The Tennessee Medicaid Program, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

75.     By reason of the payment made by the Tennessee Medicaid Program, as a result of Defendants' fraud, the State of Tennessee has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT VI

### Violations of the Tennessee False Claims Act
### Tenn. Code Ann. § 4-18-101 et seq.

76.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

77.     Defendants have knowingly presented or caused to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

78.     Defendants have knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

79.     Defendants have knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

80.     The State of Tennessee, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

81.     By reason of the payment made by the State of Tennessee, as a result of Defendants' fraud, the State of Tennessee has suffered and continues to suffer damages in an amount to be determined at trial

### PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et. seq.* and the state false claims acts identified above;

2.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in

violation of the Federal False Claims Act, as well as the maximum civil penalty for each

violation of 31 U.S.C. § 3729 in accordance with 31 U.S.C. § 3729(a)(1)(G), as adjusted by the

Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and with respect to

the state statutes cited above, the maximum damages and the maximum penalties permitted by

those statutes;

       3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C.

§ 3730(d) of the Federal False Claims Act and similar provisions of the state false claims acts

identified above;

       4.      That Relator be awarded all costs of this action, including attorneys' fees and

expenses; and

       5.      That the United States, the State of Florida, the State of Tennessee, and Relator

receive all such other relief as the Court deems just and proper.

## JURY DEMAND

       Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial

by jury.

DATED: December 6, 2019

                                       Respectfully submitted,

                                       ELAINE J. STROMGREN
                                       Florida Bar No.: 0417610
                                       ejs@wilbanksgouinlock.com

**Wilbanks and Gouinlock, LLP**
Monarch Plaza
3414 Peachtree Rd., NE
Suite 725
Atlanta, Georgia 30326
Direct Dial:  (813) 425-1039
Firm:  (404) 842-1075

MARLAN B. WILBANKS
mbw@wilbanksgouinlock.com
THOMAS HART WILLOUGHBY
thw@wilbanksgouinlock.com
**Wilbanks and Gouinlock, LLP**
Monarch Plaza
3414 Peachtree Rd., NE
Suite 725
Atlanta, Georgia 30326
(404) 842-1075

*(subject to pro hac vice admission)*

**Counsel for Relator**

23

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by Certified Mail, Return Receipt Requested, this 6th day of December, 2019 to the following:

The Honorable William Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Civil Process Clerk
U.S. Attorney's Office - Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602

Ashley Moody
Attorney General for the State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Jimmy Patronis
Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399

Kathleen Von Hoene
Medicaid Fraud Control Unit of Florida
Office of the Attorney General
The Capitol PL-01
Tallahassee, FL 32399

Herbert H. Slatery III
Attorney General and Reporter
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207

Tony Hullender
Deputy Attorney General
Medicaid Fraud and Integrity Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202

Mike Cox
Medicaid Fraud Control Unit of Tennessee
Tennessee Bureau of Investigation
901 R.S.Gass Blvd.
Nashville, TN 37216-2639

ELAINE J. STROMGREN