UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* JACQUELINE CUSHING,

      Plaintiffs,              Case No. 8:19-cv-2997-T-33TGW

v.                        **FILED UNDER SEAL**

RAJEN SHAH;
TOMOKA MEDICAL LAB, INC;
GOLDEN RULE MANAGEMENT, LLC;
TENNESSEE VALLEY REGIONAL
LABORATORY, LLC; LUMINUS
DIAGNOSTICS, LLC; and
UNITED DIAGNOSTICS, LLC

      Defendants.
_____/

## THE UNITED STATES OF AMERICA'S COMPLAINT IN INTERVENTION

    The United States of America respectfully files its Complaint in Intervention

against Rajen Shah, Tomoka Medical Lab, Inc., Tennessee Valley Regional

Laboratory, LLC, Golden Rule Management, LLC d/b/a Springs Medical Lab,

Luminus Diagnostics, LLC, and United Diagnostics Lab, LLC (collectively, "the

Defendants") under the False Claims Act ("FCA"), 31 U.S.C. § 3729 and the

common law to recover damages from false claims that Defendants presented, or

caused to be presented, to the Medicare and Medicaid programs.

    As explained below, Defendant Rajen Shah has caused false claims to be

submitted to federal healthcare programs for laboratory services that were not

ordered by a licensed healthcare provider. Mr. Shah is the owner of Defendants Tomoka Medical Lab, Inc., Tennessee Valley Regional Laboratory, LLC, and Luminus Diagnostics, LLC, which are entities that perform laboratory procedures and services and bill federal healthcare programs. In addition, Defendant Shah owns, operates or manages Golden Rule Management, LLC d/b/a Springs Medical Lab and United Diagnostics, LLC which are management companies for the laboratories.

This case involves laboratory testing fraud. There are two separate and distinct types of laboratory testing at issue in this case. The first is a basic urinalysis with a culture and sensitivity. This is the standard test that physicians order when treating their patients for a urinary tract infection. CMS reimburses it for approximately $20.

The second test is a molecular testing method known as Polymerase Chain Reaction ("PCR") Testing. This is a technique used to "amplify" small segments of DNA that can provide more comprehensive results than a traditional urinalysis. It is commonly referred to as a Urine PCR. CMS' total reimbursement for a Urine PCR is approximately between $450 - $500.

Defendant Shah's fraudulent scheme is simple. Healthcare providers treating patients with suspected urinary tract infections commonly order a basic urinalysis with a reflex to culture and sensitivity. The providers complete orders directing the laboratories to perform a basic urinalysis with a culture and sensitivity, if necessary. However, rather than perform the standard urinalysis ordered by the providers, Defendant Shah directs the laboratories to perform (and bill for) the much more

2

profitable Urine PCR test.

Thus, Defendant Shah causes his companies to bill for laboratory procedures that were not ordered by a provider, in violation of applicable Medicare rules and the FCA. Because these Defendants caused the submission of false claims in violation of the FCA, and because they were unjustly enriched, the United States brings forth this suit.

## I.   NATURE OF THE ACTION

1.    The United States brings this action to recover treble damages and civil penalties under the FCA and the common law theories of payment by mistake and unjust enrichment.

## II.   JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

3.    This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because many of the acts committed by Defendants in violation of the FCA occurred in the Middle District of Florida, and because some of the Defendants reside or transact business in the Middle District of Florida.

4.    Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because some of the Defendants reside and transact business in this District.

## III.   PARTIES

5.    The United States brings this action on behalf of the U.S. Department

of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid
Services ("CMS"), which administers the Medicare program, 42 U.S.C. §§ 1395 et
seq. ("Medicare").

6.     Plaintiff-Relator Jacqueline Cushing ("Relator"), resides in Florida and
has worked in a management role for various healthcare providers for the past 25
years. She was hired by Defendant Rajen Shah as the operations manager for
Defendant Tomoka Medical Lab, where she worked from August 8, 2019 to October
1, 2019.

7.     Defendant Rajen Shah is the owner and operator of Defendants
Tomoka Medical Lab, Inc.; Tennessee Valley Regional Laboratory, LLC; Luminus
Diagnostics, LLC; and Golden Rule Management, LLC.  He is currently employed
as a consultant with United Diagnostic, LLC, a management company owned by his
wife and sons.  Mr. Shah resides is Owensboro, Kentucky.

8.     Defendant Tomoka Medical Lab, Inc. ("Tomoka") is a facility that,
during the relevant time period, performed laboratory services and is located at 783
S. Nova Rd., Ormond Beach, Florida.   Since June 2019, Tomoka has been owned
and operated by Defendant Shah.  The State of Florida administratively dissolved
Tomoka in 2020.

9.     Defendant Tennessee Valley Regional Laboratory, LLC, d/b/a Altair
Laboratory, ("Tennessee Valley") is a facility that, during the relevant time period,
performed laboratory services that lists its principal address as 930 Adell Ree Park

Lane, Suite B, Knoxville, Tennessee, 37909. It is currently owned and operated by Defendant Shah.

10.     Both Defendants Tomoka and Tennessee Valley are often referred to as Springs Medical Lab or United Diagnostics.

11.     Defendant Luminus Diagnostics, LLC ("Luminus") is a facility that performs laboratory services that lists its principal address as 2773 Marshall Drive Suite D, Tifton, Georgia, 31793. It is currently owned and operated by Defendant Shah and does business in this District.

12.     Golden Rule Management, LLC d/b/a Spings Medical Lab ("Golden Rule"), is a management company for Tomoka and Tennessee Valley that is owned and operated by Defendant Shah. Golden Rule lists its principle address as 2200 E Parrish Ave, Building H #102, Owensboro, KY, 42301. Payments received for services performed by Tomoka and Tennessee Valley are often made to Golden Rule. Mr. Shah receives part of his compensation from Golden Rule.

13.     United Diagnostics Lab, LLC ("United Diagnostics") is an entity with a principal address of 2773 Marshall Drive Tifton, Georgia, 31793. It was incorporated in the State of Georgia on October 21, 2020 under the name of United Medical Lab, LLC and formally changed its name the following day to United Diagnostics Lab, LLC. United Diagnostics is currently owned and operated by Stephanie Shah, Jonathan Shah, and Jacob Shah, who are Defendant Shah's wife and sons. United Diagnostics owns, operates or manages several laboratories and collection sites across the country, including in this District. Mr. Shah is United

5

Diagnostics' managing partner and oversees the company's operations, sales, and marketing. Mr. Shah receives compensation from United Diagnostics.

## IV.   RELEVANT BACKGROUND

14.   In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426-426A, 1395o.  HHS is the agency responsible for administering and supervising the Medicare program, which it does through the Centers for Medicare & Medicaid Services ("CMS"), an agency of HHS.

15.   The Medicare program has several components, including Part B. Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force and from government contributions.

16.   Medicare now has four parts: Part A (Hospital Insurance); Part B (Medical Insurance); Part C (Managed Care Plans); and the Part D (Prescription Drug) Program.  This case involves claims submitted to Medicare Part B.

17.   Medicare Part B (Medical Insurance) helps pay for covered health services and supplies, but only when they are medically necessary for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)(1)(A).

18.   Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare agrees that the care is necessary and proper. Services or supplies that are needed for the

diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area where the physician practices.

19.   Medicare covers diagnostic laboratory tests ordered by a licensed provider, such as a physician or nurse practitioner.  42 C.F.R. § 410.32(a).  All healthcare providers, including laboratories, who furnish services/items to Medicare beneficiaries are required to submit a Medicare Enrollment Application. Specifically, clinical laboratories are required to submit a CMS-855B form.  In addition, to become a qualified Medicare provider, a laboratory first has to apply for and obtain a "Medicare Identification Number" (commonly referred to as a "provider number"), which is used for identification and billing purposes.

20.   In addition to the submission of an application for their initial enrollment with Medicare, all healthcare providers must submit additional applications as follows: (a) Once every five years to recertify their enrollment; (b) To notify Medicare of any changes to their enrollment status, such as change in ownership, relocation, or adverse legal actions; (c) If they are seeking reinstatement of their Medicare billing privileges after they were revoked or deactivated; and (d) If they wish to terminate their Medicare enrollment.

21.   If a Florida-based laboratory with a Medicare provider number changes ownership, the new owner, in order to continue participating in Medicare, is required to submit a Form CMS 855B, Medicare Enrollment Application, to First Coast Service Options, Inc. ("First Coast"), alerting Medicare to the change in ownership.  Pursuant to the 855B Medicare enrollment application, the new owner is

7

required to certify that he or she will not knowingly present or cause to be presented a false or fraudulent claim for reimbursement to Medicare.

22.   Healthcare providers maintain a National Provider Identifier ("NPI"), which is a standard and unique identification number for covered health care providers.  All providers and practitioners must have an assigned NPI prior to enrolling in Medicare.

23.   The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and NPI for the referring physician. 42 U.S.C. § 1395l(q)(1).

24.   To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent, known as the 837P format. Among the information the provider or supplier includes on a CMS 1500 or through the 837P format are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the NPI of the "rendering provider" and the "referring provider or other source."

25.   When submitting claims to Medicare, providers certify on the CMS 1500, inter alia, that (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information on the claim form is "true, accurate, and complete"; and (c) the provider understands that "payment and satisfaction of

this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." After a February 2012 revision to the CMS 1500, providers further certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as the Stark Law)." CMS 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." Similarly, when enrolling to submit claims electronically, providers certify that they will submit claims that are "accurate, complete, and truthful."

https://www.cms.gov/Medicare/CMS-Forms/CMS-

forms/Downloads/CMS10164B.pdf (last visited June 7, 2022).

    26. The Centers for Medicare & Medicaid Services ("CMS") adopted Current Procedural Terminology ("CPT") codes as part of Healthcare Common Procedure Coding System ("HCPCS"). The HCPCS lists the identifying codes along with descriptions of the service, supply, or equipment that correspond with each code. This HCPCS code set is divided into two principal subsystems: (1) Level I of the HCPCS, which comprised the five-digit CPT and (2) Level II of the HCPCS.

27.   Medicare and Medicaid use CPT codes to determine provider reimbursements, so healthcare providers include CPT codes on claim forms submitted to federal insurance programs.

<u>Requirements for Diagnostic X-Ray, Diagnostic Laboratory,<br>and Other Diagnostic Tests</u>

28.   According to the Medicare Benefit Policy Manual, a "treating physician" is a physician who furnishes a consultation or treats a beneficiary for a specific medical problem, and who uses the results of a diagnostic test in the management of the beneficiary's specific medical problem.  A "treating practitioner" is a nurse practitioner, clinical nurse specialist, or physician assistant, as defined in §1861(s)(2)(K) of the Social Security Act, who furnishes, pursuant to State law, a consultation or treats a beneficiary for a specific medical problem, and who uses the result of a diagnostic test in the management of the beneficiary's specific medical problem.

29.   A "diagnostic test" includes all diagnostic x-ray tests, all diagnostic laboratory tests, and other diagnostic tests furnished to a beneficiary.  A "testing facility" is a Medicare provider or supplier that furnishes diagnostic tests. A testing facility may include a physician or a group of physicians (e.g., radiologist, pathologist), a laboratory, or an independent diagnostic testing facility ("IDTF").

30.   An "order" is a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary. The order may conditionally request an additional diagnostic test for a

10

particular beneficiary if the result of the initial diagnostic test ordered yields to a

certain value determined by the treating physician/practitioner (e.g., if test X is

negative, then perform test Y).

31. The Medicare Benefit Policy Manual includes requirements for

diagnostic laboratories. It states:

> [w]hen an interpreting physician … at a testing facility determines that an ordered diagnostic radiology test is clinically inappropriate or suboptimal, and that a different diagnostic test should be performed (e.g., an MRI should be performed instead of a CT scan because of the clinical indication), the interpreting physician/testing facility may not perform the unordered test until a new order from the treating physician/practitioner has been received. Similarly, if the result of an ordered diagnostic test is normal and the interpreting physician believes that another diagnostic test should be performed (e.g., a renal sonogram was normal and based on the clinical indication, the interpreting physician believes an MRI will reveal the diagnosis), an order from the treating physician must be received prior to performing the unordered diagnostic test.

32. As noted above, the physician or other eligible professional who is

treating the beneficiary must order diagnostic laboratory tests. Tests not ordered by

the treating physician or eligible professionals are not considered reasonable and

necessary and should therefore not be billed to any government payor. 42 C.F.R. §

410.32(a). In other words, if a laboratory performs a test not ordered by the treating

provider, then the tests are not payable.

### Relevant Diagnostic Tests

33. Healthcare providers treating Medicare patients commonly treat

urinary tract infections ("UTIs"). The standard of care for detecting pathogens in

suspected UTIs and determining the most appropriate treatment is to order a

urinalysis with culture and antimicrobial susceptibility testing, as needed.  When doing so, these providers typically send orders to a laboratory or other diagnostic facility specifying what procedures to perform.

34.     A urine culture is a laboratory procedure performed on a urine specimen to establish the probable etiology of a presumed urinary tract infection. It is common practice to perform a urinalysis prior to a urine culture.  A urine culture is a method to grow and identify organisms such as bacteria that may be in the urine. An antimicrobial susceptibility test helps the physician determine the best treatment for the infection, such as an antibiotic or other drugs.

35.     In other words, a urinalysis refers to simply an analysis of the urine while the urine culture test refers to the cultivation of microorganisms in urine to determine the pathogen(s) responsible for the urinary tract infection and how to treat it.

36.     As part of their diagnosis and treatment, providers often order a "urinalysis with reflex to culture and susceptibility testing" which allows for the urinalysis to determine if a culture is indicated by parameters on the urinalysis which indicate the possibility of an infection.  With this order, the culture may or may not be performed, depending on the results of the urinalysis.  Alternatively, providers may order a "urinalysis with culture and susceptibility testing" which directs the laboratory to perform the urinalysis in parallel with the culture and susceptibility test(s).

37.     A second method for detecting pathogens in suspected UTIs is a

12

molecular testing method known as Polymerase Chain Reaction ("PCR") Testing. This is a technique used to "amplify" small segments of DNA from organisms that can provide more rapid results than a traditional culture. When used to diagnose a suspected UTI, this test is often referred to as a "Urine PCR." Urine PCR is not the standard of care for the diagnosis of UTI at this time. This is due to PCR being unable to provide a comprehensive antimicrobial susceptibility profile.

38.     All laboratory services billed to Medicare must be documented as billed and be medically necessary. As mentioned above, CPT codes are the numerical codes used primarily to identify medical services and procedures furnished by qualified healthcare professionals.

39.     The CPT codes for urinalyses are typically 81000, 81001, 81002 and 81003 and are reimbursed between $3-5. The CPT codes for a culture and antimicrobial susceptibility testing are typically 87086 or 87088 (with one or more of the following, as needed: 87181-87188) and are reimbursed between $10-20.

40.     Urine PCRs are typically billed under CPT code 87798 and are reimbursed at approximately $35 for each probe used. As multiple probes must be used for a comprehensive analysis, this test may cumulatively cost more than $490.

41.     As noted above, laboratories and diagnostic facilities cannot perform tests or procedures that are not ordered by a licensed healthcare provider. 42 CFR 410.32(a). As such, if an evaluation using a PCR test was not ordered or requested by the treating physician, then it is not reimbursable since it was not a test ordered by the physician who is treating the beneficiary.

13

## V.    THE FALSE CLAIMS ACT

42.    The FCA provides for the award of treble damages and civil penalties

for, among other things, knowingly presenting or causing the presentment of false or

fraudulent claims to the United States for payment or approval. 31 U.S.C. §

3729(a)(1)(A).

43.    The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval; . . .

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim;
. . .

is liable to the United States Government for a civil penalty of not less
than $5,000 and not more than $10,000, as adjusted by the Federal Civil
Penalties Inflation Adjustment Act of 1990 (20 U.S.C. 2461 note; Public Law
104-410), plus 3 times the amount of damages which the Government sustains
because of the act of that person.

31 U.S.C. § 3729 (internal footnote omitted).[1]

44.    For purposes of the False Claims Act, the terms "knowing" and

"knowingly":

(A)    mean that a person, with respect to information –

(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information;
or
(iii) acts in reckless disregard of the truth or falsity of the information;
and

---

[1] For conduct that occurred after November 2, 2015, civil penalties under the False Claims Act are to be assessed at the inflation-adjusted amount set forth in 28 C.F.R. § 85.5.

(B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

45.     The FCA further provides for the award of treble damages and civil penalties for, among other things, knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G).

46.     The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty per violation. 31 U.S.C. § 3729(a)(1).

## VI.   RAJEN SHAH'S BUSINESS OPERATIONS

47.     As shown below, Rajen Shah manages a complex business structure and, through his management companies, he operates his laboratories so they are largely interchangeable.  He commingles monies between the entities; maintains few corporate formalities; markets all of his laboratory services under a "doing business as" name (Springs Medical or United Diagnostics) that he uses as a catch-all name for all of the laboratories in his business operations; and has multiple facilities involved in performing a laboratory service that is later billed to federal healthcare programs.

### Golden Rule Management

48.     Defendant Shah incorporated Golden Rule in Owensboro, Kentucky in July 2013.   Later that year, he filed a Certificate of Assumed Name listing Springs Medical Lab as the assumed name.

49.     Golden Rule serves a management company for Defendant Shah's laboratories and collection sites.   Golden Rule also provides staffing services for some of Mr. Shah's laboratories.

50.     Mr. Shah uses Golden Rule's operative bank account at JPMorgan Chase to pay himself and his family members, for employee payroll and for employee benefits.

51.     Mr. Shah also uses the JPMorgan account to commingle funds from other company accounts, including Tomoka, Tennessee Valley, Luminus, and United Diagnostics.   In addition to these transfers, Mr. Shah has continued to use Golden Rule's account to deposit checks made out to his other companies, including Tomoka, Tennessee Valley, and United Diagnostics.

52.     The below chart contains some examples of transfers and deposits into the Golden Rule account from other Defendants:

| DATE OF TRANSFER | TRANSFERRING ENTITY | AMOUNT TRANSFERRED | METHOD OF PAYMENT |
|---|---|---|---|
| 10/21/20 | Tennessee Valley | $319.63 | Check |
| 1/28/21 | Tomoka | $1,280.00 | Check |
| 2/4/21 | Luminus | $25,000.00 | Wire |
| 2/9/21 | United Diagnostics | $35,000.00 | Wire |
| 3/1/21 | Tennessee Valley | $38.27 | Check |
| 4/9/21 | Luminus | $125,000.00 | Wire |
| 4/14/21 | Luminus | $100,000.00 | Wire |
| 5/13/21 | United | $812.26 | Check |

| | | | |
|---|---|---|---|
| 8/12/21 | Tennessee Valley | $114.46 | Check |
| 1/26/22 | United Diagnostics | $209.61 | Check |
| 2/2/22 | Luminus | $11,500.00 | Wire |
| 2/8/22 | United Diagnostics | $43.98 | Check |
| 2/14/22 | United Diagnostics | $201.52 | Check |
| 2/23/22 | United Diagnostics | $15,337.50 | Wire |
| | | | |

## Tomoka

53.     Defendant Shah purchased Tomoka from Mohamed Sabjouni in June 2019.  A comparison of Tomoka's urinalysis claims data from before and after Defendant Shah purchased the laboratory is instructive.

54.     As noted above, a urinalysis with a culture and sensitivity should be billed under CPT Code 87086 or 87088.  Prior to Mr. Shah purchasing Tomoka in June 2019, the lab billed Part B for significantly more traditional culture and sensitivity urinalysis tests than after his acquisition.  For example, in the twelve months prior to Mr. Shah's acquisition, Tomoka billed 2941 traditional culture and sensitivity claims.  In the year after his acquisition, however, the lab only billed the codes 398 times.

55.     Conversely, Tomoka never billed federal healthcare programs for any Urine PCR tests under CPT Code 87798 until Mr. Shah purchased the lab in June 2019.  After that date, the laboratory submitted over 1073 claims to the Medicare program for Urine PCR tests under CPT code 87798 and received $103,281.63 in reimbursement.

56.     The last time Tomoka billed Medicare Part B for CPT Codes 87086 or

17

87088 was August 2019—two months after Defendant Shah purchased Tomoka.

57.     Defendant Shah manages Tomoka's bank account.  He frequently commingles Tomoka's monies with his other entities' bank accounts, including Tennessee Valley and Golden Rule, and used Tomoka's monies to help finance loans made to Luminus.   An itemized chart depicting the transfer of Tomoka's monies to Defendant Shah's other entities is below.

| DATE | ENTITY RECEIVING FUNDS | AMOUNT | METHOD OF PAYMENT |
|---|---|---|---|
| 6/17/19 | Tennessee Valley | $20,000 | Wire |
| 8/2/2019 | Tennessee Valley | $19,000 | Check |
| 10/11/2019 | Tennessee Valley | $40,000 | Wire |
| 11/1/2019 | Tennessee Valley | $20,000 | Wire |
| 11/8/2019 | Tennessee Valley | $17,500 | Wire |
| 10/16/2019 | Spring Medical Lab | $2,500 | Check |
| 10/16/2019 | Spring Medical Lab | $7,500 | Check |
| 10/16/2019 | Tennessee Valley | $35,000 | Check |
| 10/19/2019 | Tennessee Valley | $20,000 | Check |
| 10/23/2019 | Spring Medical Lab | $15,000 | Check |
| 10/24/2019 | Tennessee Valley | $40,000 | Check |
| 10/29/2019 | Tennessee Valley | $20,000 | Check |

| 1/16/2020 | Tennessee Valley | $15,000 | Check |
|---|---|---|---|
| 2/12/2020 | Tennessee Valley | $55,000 | Check |
| 2/20/2020 | Tennessee Valley | $50,000 | Wire |
| 2/28/2020 | Tennessee Valley | $10,000 | Wire |
| 3/13/2020 | Tennessee Valley | $9,000 | Wire |
| 3/4/2020 | Golden Rule | $13,500 | Check |
| 3/6/2020 | South Georgia Banking Company (for Loan to Luminus) | $72,869.35 | Check |
| 7/14/2020 | Golden Rule | $60,000 | Wire |

58.    In addition to transferring Tomoka's monies to his other companies, Defendant Shah also commingled funds by depositing checks made out to his other entities into Tomoka's account.  For example, in February and March 2020, Tomoka deposited into its account checks made out to Spring Medical Lab.

59.    In August 2020, Medicare Part B suspended Tomoka from its program, which precluded the laboratory from submitting claims to the program.  In 2021, Tomoka began doing business as United Diagnostics.

<u>Tennessee Valley Regional Labs, LLC</u>

60.    Defendant Shah purchased Tennessee Valley in March 2018.  Again, a comparison of Tennessee Valley's urinalysis claims data from before and after Defendant Shah purchased the laboratory is instructive.   Prior to Mr. Shah

19

purchasing Tennessee Valley in March 2018, the lab billed Part B for significantly more traditional culture and sensitivity urinalysis tests than after his acquisition.

61.     For example, in 2017, Tennessee Valley billed 808 claims under CPT Code 87086[2], a code submitted for traditional culture and sensitivity.  In 2018, however, the lab only billed the code 487 times. Conversely, the lab never billed Urine PCR claims before March 2018, but then billed the code (87798) nearly 4,000 times in 2018 and 2019 combined.

62.     More specifically, since being acquired by Defendant Shah, Tennessee Valley has submitted over 3,852 Urine PCR claims to the Medicare program for Urine PCR tests under CPT code 87798 and received over $1,641,133.38 in reimbursement.

63.     Defendant Shah manages Tennessee Valley's bank account.  Similar to Tomoka's account activity, Shah frequently commingles Tennessee Valley's monies with his other entities' bank accounts.   Below is a chart identifying some of the transfers of Tennessee Valley's monies to Defendant Shah's other entities.

| DATE | ENTITY RECEIVING FUNDS | AMOUNT | METHOD OF PAYMENT |
|---|---|---|---|
| 2/22/18 | Golden Rule | $2,000 | Check |
| 3/16/18 | Golden Rule | $14,000 | Wire |

---

[2] The other CPT code submitted in connection with standard culture and sensitivities is 87088.  Tennessee Valley only submitted that code seven times during the relevant time period.

| 5/29/18 | Golden Rule | $5,000 | Wire |
|---------|-------------|--------|------|
| 6/22/18 | Golden Rule | $10,000 | Wire |
| 8/3/18 | Golden Rule | $10,000 | Wire |
| 6/3/19 | Tomoka | $50,000 | Wire |
| 7/15/19 | Tomoka | $4,500 | Wire |
| 7/17/19 | Tomoka | $4,500 | Wire |
| 7/26/19 | Tomoka | $20,000 | Wire |
| 8/23/19 | Tomoka | $13,000 | Wire |
| 12/27/19 | Tomoka | $10,000 | Wire |
| 7/16/20 | Luminus | $25,000 | Check |
| 9/16/20 | Tomoka (rent) | $11,872 | Check |

64.    In addition to transferring Tennessee Valley's monies to his other companies, Defendant Shah also commingled funds by depositing checks made out to his other entities into Tennessee Valley's account.    Below is a chart identifying examples of checks deposited into Tennessee Valley's operative account:

| DATE | ENTITY | AMOUNT | METHOD OF PAYMENT |
|------|--------|--------|-------------------|
| 3/16/18 | Spring Medical | $5,089.01 | Check |
| 5/25/18 | Spring Medical | $2,069.36 | Check |
| 7/27/18 | Spring Medical | $2,556.37 | Check |
| 12/28/18 | Spring Medical | $259.27 | Check |

| 1/16/19 | Spring Medical | $614.60 | Check |
|---------|----------------|---------|-------|
| 1/28/19 | Golden Rule | $130.39 | Check |
| 2/14/19 | Golden Rule | $130.13 | Check |
| 2/16/19 | Golden Rule | $214.05 | Check |
| 6/17/19 | Tomoka | $32.58 | Check |
| 6/19/19 | Tomoka | $345.00 | Check |
| 6/20/19 | Tomoka | $49.00 | Check |
| 6/27/19 | Tomoka | $18.70 | Check |

65.     In August 2020, Medicare Part B suspended Tennessee Valley from its

program, which precluded the laboratory from submitting claims to the program.  In

2021, Tennessee Valley began doing business as United Diagnostics.

Luminus Diagnostics

66.     Defendant Shah purchased Luminus in March 2020 and is its sole

owner.  It is located at 2773 Marshall Drive, Tifton, Georgia. Defendant Luminus is

a Georgia facility that performs laboratory services that lists its principal address as

2773 Marshall Drive Suite D, Tifton, Georgia, 31793 and its current NPI is

1336413418.  It enrolled in the Medicare program in 2012 under the name Veritas

Laboratories, LLC and changed its name to Luminus Diagnostics, LLC in 2016.

Mr. Shah purchased Luminus in March 2020.

67.     Since being acquired by Defendant Shah, Luminus has submitted over 12,523 Urine PCR claims to the Medicare program for CPT code 87798 and received over $3,642,167.48 in reimbursement.

68.     Defendant Shah manages Luminus's bank account and frequently commingles Luminus's monies with his other entities' funds.   Below is a chart identifying some of the transfers of Luminus's monies to Mr. Shah's other entities.

| DATE | ENTITY RECEIVING FUNDS | AMOUNT | METHOD OF PAYMENT |
|---|---|---|---|
| 8/11/20 | Springs Medical | $35,000.00 | Wire |
| 10/5/20 | Springs Medical | $20,000.00 | Wire |
| 6/25/21 | Springs Medical | $350,000.00 | Wire |
| 2/4/22 | Springs Medical | $11,500.00 | Wire |

### United Diagnostics

69.     In August 2020, CMS implemented a payment suspension based on credible allegations of fraud that suspended any payment Tomoka and Tennessee Valley would receive from Medicare Part A and B.   Partly as a result of these suspensions, Defendant Shah formed United Diagnostics in 2021 and named his spouse and children as owners.

70.     United Diagnostics is located at 2773 Marshall Drive, Tifton, Georgia, which is the same location as Luminus.   It is owned and operated by the Shah family.   Defendant Shah is a managing partner for United Diagnostics and oversees

the operations, sales, and marketing. His wife, Stephanie Shah, is a majority owner of United Diagnostics, but she does not receive an income. Their two sons, Jonathan and Jacob, are the other active owners of United Diagnostics.

71.     United Diagnostics is, in form and substance, a continuation of Golden Rule. It uses the same NPI as Golden Rule, and owns, operates or manages the same laboratories and collection sites across the country, including the Tomoka and Tennessee Valley locations. Like Golden Rule, United Diagnostics provides staffing to Mr. Shah's laboratories and collections sites. Mr. Shah uses United Diagnostic's operative bank accounts at JPMorgan Chase to pay himself and his family members, for lab employee payroll and for lab employee benefits, and for making lease payments on behalf of the laboratories and collection sites.

72.     Mr. Shah also uses United Diagnostic's operative accounts at JPMorgan to commingle funds from other company accounts, including Luminus and Golden Rule. Below is a chart identifying examples of commingling of funds in United Diagnostic's operative accounts at JPMorgan.

| DATE | TRANSFERRING ENTITY | AMOUNT | METHOD OF PAYMENT |
|---|---|---|---|
| 1/8/21 | Golden Rule | $10,000.00 | Wire |
| 7/5/21 | Luminus | $25,000.00 | Wire |
| 8/3/21 | Luminus | $25,000.00 | Wire |
| 9/7/21 | Luminus | $25,000.00 | Wire |
| 10/5/21 | Luminus | $25,000.00 | Wire |

| 1/26/22 | Golden Rule | $10,000.00 | Wire |
| 3/1/22 | Luminus | $150,000.00 | Check |

73.     United Diagnostics is liable for Tomoka, Luminus, Tennessee Valley, and Golden Rule's debt under the "mere continuance," "de facto merger," and "fraud," successor liability theories.

## VII.   DEFENDANTS' FRAUDULENT CONDUCT

74.     Since at least 2018 and continuing through the present, Defendant Shah has defrauded Medicare by directing his laboratories to perform and bill for laboratory tests that were not ordered by a physician or other licensed provider.

75.     Despite Medicare's requirement that laboratories only bill for diagnostic tests ordered by a licensed provider, Tennessee Valley, Tomoka and Luminus routinely performed and billed Medicare for expensive molecular tests even though the provider ordered only a basic urinalysis with culture and sensitivity.

76.     Both the requisition orders completed by the providers and interviews with these same providers establish they clearly ordered the basic urinalysis with culture and sensitivity and not the Urine PCR test.

77.     As noted above, a bacterial urine culture is a laboratory procedure performed on a urine specimen to establish the probable etiology of a presumed urinary tract infection. It is common practice to do a urinalysis prior to a urine culture. A urine culture may also be used as part of the evaluation and management of another related condition.

25

78.     A urinalysis with culture and sensitivity is billed under CPT code 87086 or 87088.  Yet, Tennessee Valley, Tomoka, and Luminus billed these procedures to Medicare under CPT code 87798[3].

79.     The Relator began working for Tomoka on August 8, 2019 as the lab's operations manager and Mr. Shah provided her with in-person training. During a four-day session, Mr. Shah explained to her Tomoka's policies and procedures and provided training on how to use LABDAQ, a software program that Tomoka uses to input requisition orders received from providers.  Mr. Shah explained that LABDAQ interfaces with a reference laboratory[4] and he instructed the Relator that when entering a provider's requisition order into LABDAQ, she was required to enter the code "UTI ID" for all standard urinalyses with culture and sensitivity.  However, the Relator soon learned that the "UTI ID" code referred to the Urine PCR test panel, not the traditional urinalysis.

80.     As part of her duties as the operations manager, the Relator had access to patient medical records and Tomoka's computer systems, including LABDAQ. With this access she observed that Tomoka was sending approximately 10 to 15 urine specimens a day to a reference lab named Solaris to perform PCR molecular tests on the specimens.  Yet, when the Relator reviewed copies of the actual orders generated by the treating physicians, she confirmed that the providers were ordering

---

[3] CMS designates CPT Code 87798 for "Infectious agent detection by nucleic acid (DNA or RNA), not otherwise specified, amplified probe technique, each organism."
[4] Reference labs are used for specialized tests that are ordered that require specialized equipment.  Because neither Tomoka nor Tennessee Valley are equipped to perform molecular tests, they refer molecular tests to reference labs.

basic urinalysis with culture and sensitivity, not the PCR molecular tests.

81.     Moreover, the Relator noted that Tomoka was also billing Medicare and Medicaid for the more expensive molecular tests.  For example, she reviewed a CMS 1500 claim form dated September 5, 2019 submitted by Tomoka to Florida Medicaid for CPT code 87798.   When she compared this claim form with the actual requisition order for the same beneficiary, she noted that the provider ordered the basic urinalysis with culture and sensitivity.  The Relator also noted that Tomoka's Medicaid claim form included a diagnosis code that the physician did not list on the requisition order.

82.     After the Relator spoke with managers and staff from other laboratories owned by Mr. Shah, she realized that the same fraudulent practices occurring at Tomoka were also occurring at Mr. Shah's other laboratories.

83.     Several providers who received the unexpected Urine PCR test results were confused and contacted Tomoka to advise that they did not order the test results they received and had only ordered a standard urinalysis with culture and sensitivity.  When the Relator addressed her concerns with Mr. Shah, he told her that he had programmed Tomoka's computer system to associate certain diagnoses with patients' claims to support the molecular tests that Tomoka billed for even though the treating physicians had not listed those diagnoses and had never ordered the more expensive tests.

84.     Brandy Nose was an officer manager of Mr. Shah's Spring Medical Laboratory in Alabama and worked at Mr. Shah's other laboratory locations,

including Tomoka. Like the Relator, she had concerns that Mr. Shah's laboratories were billing insurance programs for the Urine PCR test when the provider ordered only a standard urinalysis with a culture and sensitivity.

85.    Mr. Shah explained to Ms. Nose that every time one of his laboratories receives an order for a basic urinalysis with culture and sensitivity, a PCR test would be performed and billed. When she asked Mr. Shah why his laboratories performed the PCR test instead of the basic urinalysis, he explained that it was "because of the kickback" he received from the higher reimbursement amount.

86.    Medicare claims data identifies referring healthcare providers who order laboratory tests. The government reviewed claims data for Tomoka, Tennessee Valley, and Luminus and interviewed several physicians and nurse practitioners identified as the referring providers who ordered Urine PCR tests. Most of these healthcare providers confirmed they only ordered the basic urinalysis with culture and sensitivity and that they did not—and would not—order the PCR molecular testing.

87.    Dr. Clara Roman is a Florida physician who has been practicing medicine for more than twelve years. According to Medicare Part B claims data, Tomoka identified Dr. Clara Roman as the referring provider for 42 Urine PCR claims and received $2,482.50 in reimbursement. Dr. Roman told government investigators that she and her Advanced Registered Nurse Practitioner ("ARNP"), would typically order a urinalysis with a culture and sensitivity if necessary.

28

88.    According to Dr. Roman, no laboratory, including Tomoka, has ever spoken with her about Urine PCR tests.   Dr. Roman advised that she has never ordered a Urine PCR test and that she was frustrated to learn that she was the referring provider for a test she never ordered.

89.    Heather Lee is a nurse practitioner in Tennessee who owns her own medical practice called Elder Care of Knoxville.  According to Medicare Part B claims data, Tennessee Valley identified Heather Lee as the referring provider for 104 Urine PCR claims and the lab received $53,097.46 in reimbursement.  In addition, according to Medicare Part B claims data Luminus identified Heather Lee as the referring provider for 15 Urine PCR claims and the lab received $5,930.21.

90.    Ms. Lee told government investigators that she has only ordered a Urine PCR test on only two occasions, both in 2021.  When one of her patients has a suspected UTI, she orders a standard urinalysis with a culture and sensitivity, if necessary.  Ms. Lee further advised that she was not even familiar with the Urine PCR test until 2021 and that nobody from Tennessee Valley or Luminus had spoken with her about the procedure.

91.    Amy Olson is a Tennessee nurse practitioner who treats Medicare beneficiaries.  According to Medicare Part B claims data, Tennessee Valley identified Ms. Olson as the referring provider for 21 Urine PCR claims and received $9,824.90 in reimbursement.  In addition, according to Medicare Part B claims data Luminus identified Ms. Olson as the referring provider for 42 Urine PCR claims and received $17,334.46.

92.     Ms. Olson told government investigators that she has never ordered a

Urine PCR test.  When one of her patients has a suspected UTI, she orders a

standard urinalysis with a reflex to culture and sensitivity.  Ms. Olson further advised

that nobody from any of Mr. Shah's laboratories had spoken with her about the

Urine PCR tests.

93.     Perhaps most alarmingly, the government interviewed one physician—

Dr. Mark Gillespy—who is named in Medicare claims data as the referring physician

for more than 100 Urine PCR tests billed by Tomoka under CPT Code 87798.  Not

only did Dr. Gillespy confirm that he did not order these tests, nearly all of the listed

beneficiaries were not even his patients.  Tomoka submitted 1,059 Urine PCR claims

and received $68,357.69 in payments for these fraudulent tests that Dr. Gillespy

never ordered.

### Healthcare Providers Notified Rajen Shah that His Labs Were Performing Tests They Did Not Order

94.     Beginning in 2019, healthcare providers began to complain that

Defendant Shah was causing his laboratories to perform Urine PCR tests when they

had ordered culture and sensitivity tests.

95.     Dr. Bruce Wallstedt is a Tennessee physician who owns BlueSky House

Calls ("BlueSky"), a mobile provider group that treats geriatric patients.  According

to Medicare Part B claims data, Tennessee Valley identified Dr. Bruce Wallstedt as

the referring provider for 181 Urine PCR claims and the lab received $91,400.96 in

reimbursement.   Additionally, according to Medicare Part B claims data, Luminus

identified Dr. Bruce Wallstedt as the referring provider for 10 Urine PCR claims and the lab received $3,649.36 in reimbursement.

96.     As part of his treatment for UTIs, Dr. Wallstedt and other BlueSky providers, order a routine urinalysis with a reflex to culture and sensitivity.   Dr. Wallstedt and his providers do not order PCR testing as part of a plan of care for treating UTIs.

97.     In early 2020, Dr. Wallstedt learned that Tennessee Valley[5] was performing PCR testing on urine samples even though he was ordering a routine urinalysis with a reflex to culture and sensitivity.

98.     Dr. Wallstedt found the PCR test results to be unnecessary and confusing and his office immediately notified Springs Medical that he had not ordered PCR testing.   In spite of this knowledge, Mr. Shah's laboratories continued to bill government healthcare programs for urine PCR tests when Dr. Wallstedt ordered urinalyses with culture and sensitivities.

99.     In April 2020, Dr. Wallstedt's office informed Mr. Shah that his laboratory was still performing Urine PCR tests in spite of what the provider ordered.   On April 17, 2020, Dr. Wallstedt's office emailed the following

> Reaching out because it has come to my attention that our UA/C&S orders sent to Spring are having Antibiotic Resistance and PCR panels sent back, rather than the UA/C&S we requested.   To my knowledge, these tests are very expensive and are not what we originally ordered. Can you clarify why Springs would be taking the liberty to run these tests?

---

[5] Dr. Wallstedt's office refers to Tennessee Valley as "Springs Medical" or "Springs."

100.   Mr. Shah spoke with Dr. Wallstedt's office manager and assured him that this problem would be corrected moving forward.

101.   Just six months later, Dr. Wallstedt's office discovered that Mr. Shah's laboratory was again performing Urine PCR tests even though the provider ordered a urinalysis with culture and sensitivity.  On October 21, 2020, the office manager emailed Mr. Shah that:

> One of our providers recently received two UTI pathogen panel results from your lab, despite him only ordering UA/C&S tests.  Last time we spoke on this subject, you reassured us this would no longer occur.  As such, we will need Springs lab to rebill these labs as UA/C&S or otherwise write them off....We will remain vigilant in watching for this error to occur.  As I detailed in our last discussion, we are responsible for the healthcare costs related to our patients and the proper utilization of healthcare services....I will continue to follow up to make sure this error is rectified.

102.   Mr. Shah apologized and explained that recently-hired employees made the mistake.

103.   In February 2021, Dr. Wallstedt's office manager again discovered that Mr. Shah's laboratory was performing Urine PCR tests when the provider ordered a traditional urinalysis with a culture and sensitivity.  He emailed Springs Lab that "[o]ne of my providers notified me that a Urine PCR test was performed, though not ordered, for one of our patients....Since we did not order this test, and knowing this test carries a lofty price tag, we kindly ask that his be written off, or adjusted if previously billed to Medicare."

104. A week later, the office manager again emailed Springs Lab that "[l]ooks like it's happened again....We are vigilant in making sure the results we receive are for the orders we send. We've asked Rajen to discontinue this practice many months ago. I ask that this stop."

105. On March 22, 2021, the office manager again emailed Springs Lab to inform them that:

> Many more PCR tests have come through. I thought we had this resolved? I am receiving complaints from each of my providers over this unwarranted action....We will be following up with Medicare to ensure these are not only written off patient balances, but also Medicare's....Unsolicited PCR testing comes at a direct cost to our practice and will not be tolerated.

106. In spite of this knowledge, Luminus nonetheless continued to bill government healthcare programs for Urine PCR tests when Dr. Wallstedt ordered urinalyses with culture and sensitivities. In June 2021, Dr. Wallstedt's office discovered more Urine PCR tests that had not been ordered and notified Mr. Shah's laboratory via email.

107. According to Dr. Wallstedt's office, some of the patients identified in the relevant claims data for Luminus are not BlueSky patients.

108. According to Medicare Part B claims data, Tennessee Valley identified Dr. Bruce Wallstedt as the referring provider for 181 Urine PCR claims and the lab unlawfully received $91,400.96 in reimbursement. In addition, Tenneesee Valley billed 47 Urine PCR claims identifying another BlueSky provider, Jeffrey Beard, and

33

received $23,346.31 in reimbursements. Because neither Dr. Wallstedt nor any BlueSky provider ordered any Urine PCR testing, each of these claims is false.

109.   According to Medicare Part B claims data, Luminus identified Dr. Bruce Wallstedt as the referring provider for 10 Urine PCR claims and the lab received $3,649.36 in reimbursement. In addition, Luminus identified other BlueSky providers as the referring providers for 91 Urine PCR claims and received $38,555.57 in reimbursement.   Because neither Dr. Wallstedt nor any BlueSky provider ordered any Urine PCR testing, each of these claims is false.

110.   Along with Dr. Wallstedt, Tammy Browning also notified Mr. Shah that he was performing tests that were not ordered by a healthcare provider.

111.   Ms. Browning is a certified Physician Assistant (PA-C) and is licensed to practice medicine in the state of Indiana who founded a healthcare company that provides primary care services for adults who are unable leave their home to receive medical care.

112.   In October 2020, Ms. Browning learned from one of her nurse practitioners that Luminus was performing PCR testing when providers were only ordering standard urinalysis with culture and sensitivity.

113.   As a result, Ms. Browning sent an email to Mr. Shah stating: "Lately I have been seeing results come through for an ordered UA C&S as a Panel UTI DX (the Urine PCR test).... This is NOT a test result I find useful or want to have run. I would like the traditional UA with Culture & Sensitivity. If we are ordering

34

incorrectly please let us know... but I want to make sure that we don't continue to get these types of results without the needed C&S results[.]"

114.   Defendant Shah responded later that day by advising Ms. Browning of the benefits of PCR testing.  However, Ms. Browning disagreed, and informed Mr. Shah: "I have two patients currently that I am reviewing UA C&S results on and they are the UTI PCR results which do not give me any Sensitivity information. I need to know when I can expect to receive the results that I requested to be able to appropriately provide patient care."

115.   In a subsequent phone call, Ms. Browning warned Defendant Shah that changing uranalysis orders without first consulting with the providers constituted "Medicare fraud."

116.   In spite of Ms. Browning's clear directive to Defendant Shah regarding how she wished to treat her patients, his laboratory continued to perform urine PCR testing and billed government healthcare programs for the unauthorized test.  In February 2021, she emailed Defendant Shah:

> I know we have had previous discussions in Oct 2020 about the conversion of ordered UA C&S to a PCR UTI DX test by the lab (without provider approval).  I want to be clear that effective immediately when any [] provider orders a UA or UA with C&S we expect that test to be run (not a PCR). We have a test code UTIDX (Luminos) (sic) that indicates the PCR test and when requested by the provider this code will be utilized. However, any conversion otherwise from the ordered test to the PCR is not authorized by [her company] or it's providers.

## VIII. DEFENDANTS SUBMITTED, OR CAUSED TO BE SUBMITTED, FALSE CLAIMS TO MEDICARE AND MEDICAID

117.    Since Rajen Shah purchased Tomoka, Tennessee Valley and Luminus, these Defendants have submitted a total 17,448 claims to Medicare Part B and received over $5 million in reimbursement.  Most of these claims resulted from tests that were not ordered by a licensed provider and were, therefore, medically unnecessary and false.

### Tomoka

118.    During the Relevant Period, Tomoka submitted over 1,073 Urine PCR claims to the Medicare program and received over $103,281.63 in reimbursement. Many—if not all—of these claims are false.

119.    For example, in September 2019, Dr. Clara Roman ordered a standard urinalysis with culture and sensitivity for Patient A, a Medicare beneficiary.  The claim for the urinalysis should have been submitted under CPT code 81000 and the culture and sensitivity under code 87088.  However, on September 27, 2019, Defendant Tomoka submitted two claims to Medicare Part B seeking reimbursement under CPT code 87798 and received $506.47.

120.    According to Medicare Part B claims data, Tomoka identified Dr. Clara Roman as the referring provider for 42 Urine PCR claims and received $2,482.50 in reimbursement.  Because Dr. Roman never ordered any Urine PCR tests, each of these claims submitted by Tomoka is false.

121.    As another example, on June 25, 2019, Dr. Koruth Pothen ordered a

36

standard urinalysis with culture and sensitivity for Patient B, a Medicare Part C

beneficiary. The physician's requisition form specifically listed CPT Code 87088.

However, on approximately August 23, 2019, Tomoka submitted a claim to

Medicare Part C seeking reimbursement for CPT Code 87798 and received $496.73.

This claim is also false.

Tennessee Valley

122.    During the Relevant Period, Tennessee Valley submitted over 3,852

claims to the Medicare program for CPT code 87798 and received over

$1,641,133.38 in reimbursement.  Many of these claims are false.

123.    For example, on August 26, 2019, Dr. Bruce Wallstedt ordered a

standard urinalysis with culture and sensitivity for Patient C, a Medicare beneficiary.

The claim for the urinalysis should have been submitted under CPT code 81000 and

the culture and sensitivity under code 87088.  However, on August 27, 2019,

Defendant Tennessee Valley submitted a claim to Medicare Part B seeking

reimbursement under CPT code 87798 and received $496.73.

124.    According to Medicare Part B claims data, Tennessee Valley identified

Dr. Bruce Wallstedt as the referring provider for 181 Urine PCR claims and received

$91,400.96 in reimbursement.   Because Dr. Wallstedt never ordered a Urine PCR

test, each of these claims submitted by Tennessee Valley is false.

125.    As another example, in January 2019, Nurse Practitioner Heather Lee

ordered a standard urinalysis with culture and sensitivity for Patient D, a Medicare

beneficiary.  The claim for the urinalysis should have been submitted under CPT

37

code 81000 and the culture and sensitivity under code 87088. However, on January 24, 2019, Defendant Tennessee Valley submitted a claim to Medicare Part B seeking reimbursement under CPT code 87798 and received $496.73.

126.   According to Medicare Part B claims data, Tennessee Valley identified Heather Lee as the referring provider for 104 Urine PCR claims and received $53,097.46 in reimbursement.   Because Ms. Lee never ordered a Urine PCR test from Tennessee Valley, each of these claims submitted by Tennessee Valley is false.

Luminus

127.   During the Relevant Period, Luminus has submitted over 12,523 Urine PCR claims to the Medicare program for CPT code 87798 and received over $3,642,167.48 in reimbursement.  Many of these claims are false.

128.   For example, in February 2021, Dr. Bruce Wallstedt ordered a standard urinalysis with culture and sensitivity for Patient E, a Medicare beneficiary. The claim for the urinalysis should have been submitted under CPT code 81000 and the culture and sensitivity under code 87088.  However, on February 12, 2021, Defendant Luminus submitted a claim to Medicare Part B seeking reimbursement under CPT code 87798 and received $456.17.

129.   According to Medicare Part B claims data, Luminus identified Dr. Bruce Wallstedt as the referring provider for 10 Urine PCR claims and received $3,649.36 in reimbursement.  Because Dr. Wallstedt never ordered a Urine PCR test, each of these claims submitted by Luminus is false.

130.    As another example, in November 2021, Nurse Practitioner Amy Olson ordered a standard urinalysis with culture and sensitivity for Patient F, a Medicare beneficiary.  The claim for the urinalysis should have been submitted under CPT code 81000 and the culture and sensitivity under code 87088.  However, on November 16, 2021, Defendant Luminus submitted a claim to Medicare Part B seeking reimbursement under CPT code 87798 and received $456.17.

131.    According to Medicare Part B claims data Luminus identified Ms. Olson as the referring provider for 42 Urine PCR claims and received $17,334.46. Because Ms. Olson never ordered a Urine PCR test, each of these claims submitted by Luminus is false.

132.    As another example, in January 2021, Nurse Practitioner Nikki O'Rourke ordered a standard urinalysis with culture and sensitivity for Patient G, a Medicare beneficiary.  The claim for the urinalysis should have been submitted under CPT code 81000 and the culture and sensitivity under code 87088.  However, on January 15, 2021, Defendant Luminus submitted a claim to Medicare Part B seeking reimbursement under CPT code 87798 and received $456.17.  Because Ms. O'Rourke did not order a Urine PCR test, this claim is false.

## FIRST CAUSE OF ACTION
False Claims Act: Presentation of False Claims
31 U.S.C. § 3729(a)(1)(A)

133.    The United States repeats and realleges the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

39

134.   This is a claim for treble damages and civil penalties for each violation of the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

135.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

136.   These include claims for laboratory procedures and services that were false because they were not ordered by the referring provider and were not medically necessary or indicated.

137.   Defendants presented, and caused to be presented, these false claims with actual knowledge of their falsity, or with deliberate ignorance or reckless disregard of the truth or falsity of the claims.

138.   As a result, the United States has suffered actual damages in an amount to be determined at trial, plus civil penalties for each violation.

**SECOND CAUSE OF ACTION**
False Claims Act: Making and Using False Records and Statements
to Get False Claims Paid by Defendants
31 U.S.C. § 3729(a)(1)(B)

139.   The United States repeats and realleges the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

140.   As more fully alleged in the above paragraphs, Defendants knowingly made and used, or caused to be made and used, false records and statements to get false and fraudulent claims paid by the United States for laboratory procedures and

services that were not ordered by the referring provider and were not medically necessary or indicated.

141.   As more fully alleged in the above paragraphs, Defendants made and used these false records and statements, or caused these false records and statements to be made and used, and for which it sought and received reimbursement from Medicare.

142.   By virtue of the false records and statements that Defendants made and used, or caused to be made and used, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

**THIRD CAUSE OF ACTION**
False Claims Act: Avoiding an Obligation to Refund
31 U.S.C. § 3729(a)(1)(G)

143.   The United States repeats and re-alleges the allegations contained in paragraphs 1 through 132 of this complaint as if fully set forth herein.

144.   As more particularly set forth in the paragraphs 94 through 116, licensed healthcare providers gave notice to Mr. Shah that his laboratories were performing tests they did not order, and as such, had received monies from government healthcare programs that they were not entitled to.   Accordingly, Defendants knowingly made, used, or caused to be made or used, false records or statements—*i.e.*, the false certifications made or caused to be made by Defendants— material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or

41

transmit money or property to the government.

145.    As a result, the United States has suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

### FOURTH CAUSE OF ACTION
Conspiracy to Violate the False Claims Act
31 U.S.C. § 3729(a)(1)(C)
(Defendants United and Luminus)

146.    The United States repeats and realleges the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

147.    Defendants United and Luminus knowingly conspired with the remaining Defendants to violate 31 U.S.C. § 3729(a)(1)(A), (B) and (G) to submit and cause the submission of false claims and to make, use, and cause to make or use, false records and statements material to false or fraudulent claims to the United States and use false records and statements material to false or fraudulent claims, and to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government.

148.    By virtue of the false records and statements that Defendants made and used, or caused to be made and used, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

### FIFTH CAUSE OF ACTION
Payment by Mistake (Defendants Tomoka, Tennessee Valley, and Luminus)

149.    The United States repeats and re-alleges the allegations contained in

paragraphs 1 through 132 of this complaint as if fully set forth herein.

150.   This is a claim for the recovery of monies paid by the United States to Defendants as a result of mistaken understandings of fact.

151.   The false claims that Defendants presented, or caused to be presented, to the United States constituted misrepresentations of material facts in that they misrepresented that the services provided were medically necessary, when they were not.

152.   The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid Defendants certain sums of money to which they were not entitled and are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.  Had the United States known the truth, it would not have paid such claims and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to which they were not entitled. Payment was therefore by mistake.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

153.   The United States repeats and re-alleges the allegations contained in paragraphs 1 through 132 of this complaint as if fully set forth herein.

154.   This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

155.   By obtaining government funds to which they were not entitled,

Defendants were unjustly enriched, and is liable to account for and pay for such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants as follows:

I.      On the Counts I-IV under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.     On the Fifth Count for payment by mistake, for the amounts the United States paid by mistake, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

III.    On the Sixth Count for unjust enrichment, for the amounts by which defendants were unjustly enriched, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

IV.     That the United States be awarded its costs and its expenses of this action, pursuant to 31 U.S.C. §3729(a)(3).

V.      That the United States be granted such other and further relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

44

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

Dated: August 9, 2022          By:    _____

SEAN P. KEEFE
Assistant United States Attorney
Florida Bar No.: 0413828
400 North Tampa Street, Ste 3200
Tampa, FL 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6200
Email: sean.keefe@usdoj.gov

*Counsel for the United States of America*

45