## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA
ex rel. JACQUELINE CUSHING,

     Plaintiffs,

v.                         CASE NO. 8:19-cv-2997-VMC-TGW

RAJEN SHAH, et al.

     Defendants.

_____/

## REPORT AND RECOMMENDATION

This cause came on for consideration upon the Motion for Default Judgment (Doc. 67) by the United States of America ("the government"), one of the plaintiffs in this matter, which has been referred to me for a report and recommendation by United States District Judge Virginia Hernandez Covington. In support of its motion, the government has filed the declaration of Assistant United States Attorney Sean P. Keefe and supplemental authority (see Docs. 68, 69). For the reasons discussed, I recommend that the Motion for Default Judgment (Doc. 67) be granted and that default judgment be entered against the defendants, Rajen Shah, Tomoka Medical Lab, Inc. ("Tomoka"), Tennessee Valley Regional Laboratories, LLC ("Tennessee Valley"), Luminus Diagnostics, LLC

1

("Luminus"), Golden Rule Management, LLC ("Golden Rule"), and United Diagnostics Lab, LLC ("United Diagnostics").

I.

On August 9, 2022, the government filed a complaint against the defendants wherein it alleged that the defendants improperly submitted false claims to Medicare and Medicaid programs, in violation of the False Claims Act ("FCA") and common law (see Doc. 24). Concurrently, the government filed a Motion for Pre-Judgment Remedies (Doc. 25) pursuant to the Federal Debt Collection Procedures Act, which was granted by Judge Covington (see Doc. 32).

In its complaint, the government alleges that defendant Rajen Shah is the owner of defendants Tomoka, Tennessee Valley, Luminus, and Golden Rule (Doc. 24, p. 2; Doc. 67, p. 5).[1] These defendant companies, except for Golden Rule, would perform various laboratory procedures and services for healthcare providers and then bill federal healthcare programs, such as Medicare and Medicaid (id.). Defendant Shah is also a consultant for defendant United Diagnostics, which is owned by his wife, Stephanie Shah,

---

[1] "Both Defendants Tomoka and Tennessee Valley are often referred to as Springs Medical Lab or United Diagnostics" (Doc. 24, p. 5, ¶ 10).

and sons, Jonathan and Jacob Shah (Doc. 24, p. 2; Doc. 67, p. 7). Thus, defendants United Diagnostics and Golden Rule are management companies for the other defendant laboratory companies (id.).

As indicated, the government asserts that defendant Shah, through these companies, made false claims to Medicare and Medicaid. Specifically, defendant Shah's laboratories would perform a more expensive laboratory test as opposed to the cheaper test requested by the healthcare providers. Thus, the government explains (Doc. 24, pp. 2–3):

> This case involves laboratory testing fraud. There are two separate and distinct types of laboratory testing at issue in this case. The first is a basic urinalysis with a culture and sensitivity. This is the standard test that physicians order when treating their patients for a urinary tract infection. [Centers for Medicare and Medicaid Services "CMS"] reimburses it for approximately $20.
>
> The second test is a molecular testing method known as Polymerase Chain Reaction ("PCR") Testing. This is a technique used to "amplify" small segments of DNA that can provide more comprehensive results than a traditional urinalysis. It is commonly referred to as a Urine PCR. CMS' total reimbursement for a Urine PCR is approximately between $450-$500.
>
> Defendant Shah's fraudulent scheme is simple. Healthcare providers treating patients with suspected urinary tract infections commonly order

3

a basic urinalysis with a reflex to culture and sensitivity. The providers complete orders directing the laboratories to perform a basic urinalysis with a culture and sensitivity, if necessary. However, rather than perform the standard urinalysis ordered by the providers, Defendant Shah directs the laboratories to perform (and bill for) the much more profitable Urine PCR test.

The government began its investigation of defendant Shah and his companies in 2020 (Doc. 68, p. 2). From that investigation, the government alleges that defendant Shah, through his various companies, knowingly conducted this fraudulent conduct from 2018 through 2022 (id.). In support of that contention, the government provides several complaints of medical providers to defendant Shah about the improper Urine PCR test orders (Doc. 24, pp. 30–35). Moreover, the government states that—despite these complaints—defendant Shah continued to bill for these tests, even when he said that his companies would discontinue this practice (id.).

While defense counsel accepted service of the complaint on August 29, 2022, and on September 28, 2022, counsel waived service on the defendants' behalf, the defendants have otherwise failed to appear or respond in this matter (Doc. 67, p. 3; Doc. 51). Thus, the government filed a motion for clerk's entry of default and default was subsequently entered (see Docs.

4

57, 58, 59, 60, 61, 62, 63, 64). The defendant later filed the present motion for default wherein it seeks damages for its various claims (see Doc. 67). Importantly, I issued an order directing the government to indicate whether it intended to seek damages under both the FCA claims and its common law claims (see Doc. 72). The government filed a supplemental memorandum which states that it only seeks damages pursuant to the FCA claims (Doc. 73, p. 1).

## II.

Pursuant to Rule 55(b)(2), Fed.R.Civ.P., a party may seek from the court a default judgment for the amount of the damages caused by the defaulting party. Before entering a default judgment, the court must ensure that it has jurisdiction over the claims and the parties and, further, that the well-pleaded factual allegations of the complaint adequately state a claim upon which relief may be granted. Thus, the Eleventh Circuit discussed the standards governing entry of default judgment in Surtain v. Hamlin Terrace Foundation, 789 F.3d 1239, 1244–45 (11th Cir. 2015):

> When a defendant has failed to plead or defend, a district court may enter judgment by default. Fed.R.Civ.P. 55(b)(2). Because of our "strong policy of determining cases on their merits," however, default judgments are generally

disfavored. In re Worldwide Web Sys., Inc., 328
F.3d 1291, 1295 (11th Cir. 2003). "[W]hile a
defaulted defendant is deemed to admit the
plaintiff's well-pleaded allegations of fact, he is
not held to admit facts that are not well-pleaded or
to admit conclusions of law." Cotton v. Mass. Mut.
Life Ins. Co., 402 F.3d 1267, 1278 (11th Cir.2005)
.... Entry of default judgment is only warranted
when there is "a sufficient basis in the pleadings
for the judgment entered." Nishimatsu Constr. Co.
v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th
Cir. 1975).

... [W]e have ... interpreted the standard as being
akin to that necessary to survive a motion to
dismiss for failure to state a claim. See Chudasama
v. Mazda Motor Corp., 123 F.3d 1353, 1370 n. 41
(11th Cir. 1997) ("[A] default judgment cannot
stand on a complaint that fails to state a claim.")
              ....

When evaluating a motion to dismiss, a court looks
to see whether the complaint "contain[s] sufficient
factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.'" Ashcroft v.
Iqbal, 556 U.S. 662, 678 ... (2009) (quoting Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 570 ...
(2007)). This plausibility standard is met "when
the plaintiff pleads factual content that allows the
court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Id.
(citing Twombly, 550 U.S. at 556 ...).

Furthermore, "[w]hen entry of default is sought against a party

who has failed to plead or otherwise defend, the district court has an

6

affirmative duty to look into its jurisdiction both over the subject matter and the parties." System Pipe & Supply, Inc. v. M/V VIKTOR KURNATOVSKIY, 242 F.3d 322, 324 (5th Cir. 2001). As set forth by the government, the court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a). Further, this court has personal jurisdiction over the various defendants pursuant to 31 U.S.C. § 3732(a).

III.

To state a claim for liability under the FCA, the government must allege that the defendant "(A) knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement" in order to get a false or fraudulent claim paid or approved by the government. 31 U.S.C. § 3732(a)(1). "Knowingly" is defined as having "actual knowledge," "deliberate ignorance," or "reckless disregarding." 31 U.S.C. § 3729(b)(1). Further, a showing of a "specific intent to defraud" is not required. Id. However, "the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence." Urquilla-Diaz v. Kaplan University, 780 F.3d 1039, 1058 (11th Cir. 2015). Thus, in sum, to

prevail on an FCA claim, the government must show that the defendants (1) made a false statement, (2) with scienter, (3) that is material, and that (4) the statement caused the government to make a false payment. United States v. Cross Garden Care Center, LLC, 8:16-CV-961-T-27AEP, 2019 WL 6493972 at *3 (M.D. Fla. Dec. 3, 2019). The government has alleged that the defendants violated various sections of the FCA, which are assessed below.

Notably, Rule 9(b) of the Federal Rules of Civil Procedure provides an additional requirement for allegations of fraud. Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," however, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P 9(b). For claims asserted under the FCA, Rule 8 of the Federal Rules of Civil Procedure is supplemented, but not replaced, by Rule 9(b). Thus, this means that the complaint "'must state with particularity the circumstances constituting fraud,'" and must set forth the "'facts as to time, place, and substance of the defendant's alleged fraud'" as well as "'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." Urquilla-Diaz v. Kaplan University, supra, 780 F.3d

at 1058; <u>United States ex rel. Clausen</u> v. <u>Laboratory Corp. of America., Inc.,</u> 290 F.3d 1301, 1308 (11th Cir. 2002) (internal citations omitted). The complaint is sufficient because the allegations are sufficient to state a claim to relief that is plausible on its face, as well as to meet the heightened pleading standard under Rule 9(b).

A. <u>Count 1: Presentment of False Claims 31 U.S.C. § 3729(a)(1)(A)</u>.

The government asserts that the "[d]efendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A)" (Doc. 24, p. 40, ¶135). This section imposes liability on any person that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

The essential element under this section is whether the defendant "presented or caused to be presented" a false claim. <u>Urquilla-Diaz</u> v. <u>Kaplan University</u>, <u>supra</u>, 780 F.3d at 1052 (internal citation omitted). Further, to satisfy Rule 9(b), the government "must allege the actual presentment of a claim . . . with particularity, meaning with particular facts about the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." <u>Id</u>. at 1052. To do so, the government may

9

provide exact billing data—name, date, amount, and services rendered—or attach a representative sample claim. <u>United States ex. rel. Mastej</u> v. <u>Health Management Associates, Inc.</u>, 591 Fed. App'x 693, 704 (11th Cir. 2014). However, "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." <u>Id.</u> (internal citation omitted). Rather, a complaint must contain "some indicia of reliability" that a false claim was actually submitted.

The government has set out multiple instances where defendant Shah made false claims to it. As indicated, the government alleges that defendant Shah, through the various defendant companies, would order a more expensive Urine PCR test from Medicare for CPT code 87798 as opposed to the cheaper, basic urinalysis with culture and sensitivity for CPT code 87086 or 87088 (Doc. 24, p. 26, ¶78). The relator in this matter, who began working for defendant Tomoka on August 8, 2019, as operations manager and had access to patient medical records, states that she observed 10 to 15 of these claims per day (<u>id.</u>, ¶¶79–80).

Furthermore, these allegations are supported by other Medicare claims data. For instance, Medicare Part B claims data revealed that defendant Tomoka listed Dr. Clara Roman as the referring provider on 42

Urine PCR claims (id., pp. 28–29, ¶¶87–88). However, a subsequent interview of Dr. Roman by the government revealed she instead ordered urinalysis with a culture and sensitivity (id.). In addition, this section of the complaint identifies other providers who told defendant Shah that he or she had not ordered Urine PCR tests (id., pp. 29–30). One of them, Dr. Mark Gillespy, stated that not only did he not order Urine PCR tests, but that nearly all of the listed beneficiaries were not even his patients (id., p. 30, ¶93).

Thus, while the government does not provide exact billing data, the evidence it has provided clearly presents sufficient indicia of reliability. Courts have found that evidence of unnecessary claims billed to Medicaid for unnecessary medical services, by itself, are actionable under the FCA. See, e.g., United States ex. rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 376–77 (5th Cir. 2004); United States ex. rel. Polukoff v. St. Mark's Hospital, 895 F.3d 730, 742 (10th Cir. 2018); 693, 704 (11th Cir. 2014); United States v. Cross Garden Care Center, LLC, supra, 2019 WL 6493972 at *4. As stated, the government has provided evidence, such as the interviews with medical providers, in conjunction with evidence of unnecessary claims. Accordingly, the government has satisfied the elements of this claim.

11

B. Count II: Making a False Record or Statement to a False Claim 31
   U.S.C. § 3729(a)(1)(B).

For this count, the government asserts that the "[d]efendants knowingly made and used, or caused to be made and used, false records and statements to get false and fraudulent claims paid by the United States for laboratory procedures and services that were not ordered by the referring provider and were not medically necessary or indicated" (Doc. 24, pp. 40–41, ¶140). Thus, the government asserts that the defendants used these false records and statements to receive reimbursements from Medicare, which resulted in the United States suffering damages (id., p. 41, ¶¶141–142).

Section 3729(a)(1)(B) creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Thus, to prove a claim under this section, the government must show that "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." United States ex rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1154 (11th Cir. 2017). The term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt

12

of money or property." 31 U.S.C. § 3729(b)(4).

The government has satisfied this claim as well. As discussed, defendant Shah, through the various defendant companies, would order a more expensive Urine PCR test from Medicare for CPT code 87798 as opposed to the cheaper, basic urinalysis with culture and sensitivity for CPT code 87086 or 87088 (Doc. 24, p. 26, ¶78). Further, the government has established that defendant Shah knowingly made these statements. Thus, the government sets forth the conversations and statements of various persons who informed defendant Shah that the orders made to Medicare were incorrect and warned that such statements were fraudulent and, despite this, defendant Shah continued making the false claims (id., pp. 30–35, ¶¶94–116). For instance, Tammy Browning, a certified Physician Assistant, emailed the following to defendant Shah (id., pp. 34, 35 ¶¶111, 116).:

> I know we have had previous discussions in Oct 2020 about the conversion of ordered UA C&S to a PCR UTI DX test by the lab (without provider approval). I want to be clear that effective immediately when any [] provider orders a UA or UA with C&S we expect that test to be run (not a PCR). We have a test code UTIDX (Luminos) (sic) that indicates the PCR test and when requested by the provider this code will be utilized. However, any conversion otherwise from the ordered test to the PCR is not authorized by my or

it's providers.

Moreover, it is alleged that, upon questioning, defendant Shah admitted that "his laboratories performed the PCR test instead of the basic urinalysis . . . 'because of the kickback' he received from the higher reimbursement amount" (id., p. 28, ¶85). Thus, the government has clearly set forth enough factual matter to satisfy the elements of this count. 31 U.S.C. § 3729(a)(1)(B).

C. Count III: Avoiding an Obligation to Refund 31 U.S.C. § 3729(a)(1)(G).

Section 3729(a)(1)(G) creates liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government," or who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government." 31 U.S.C. § 3729(a)(1)(G). This section, known as the "reverse-false-claim provision" was added "to provide that an individual who makes a material misrepresentation to avoid paying money owed to the Government would be equally liable under the Act as if he had submitted a false claim to receive money." Cullins v. Astra, Inc., 09-60696-CIV, 2010

14

WL 625279 at *5 (S.D. Fla. Feb. 17, 2010) (internal citation omitted). Thus, under this section "the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." Hoyte v. Am. Nat'l Red Cross, 518 F.3d 61, 63 n.1 (D.C.Cir. 2008) (quoting United States ex rel. Bain v. Ga Gulf Corp., 386 F.3d 648, 653 (5th Cir. 2004).

"Importantly, to establish a reverse false claim cause of action, a relator must show that the defendant owed a definite and clear 'obligation to pay money to the United States at the time of the allegedly false statements.'" United States v. Space Coast Medical Associates, L.L.P., 94 F. Supp. 3d 1250, 1263 (M.D. Fla. 2015) (internal citation omitted). "Congress has defined a False Claim Act 'obligation' as 'an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.'" 31 U.S.C. § 3729(b)(3).

The government asserts that "licensed healthcare providers gave notice to Mr. Shah that his laboratories were performing tests they did not order, and as such, had received monies from government healthcare

programs that they were not entitled to" (Doc. 24, p. 41, ¶144). As previously discussed, the government has provided ample evidence that the defendants made false claims to Medicare for reimbursement, even after they had been repeatedly warned the claims were false. Moreover, the government states, with specificity, the amounts owed to it by the defendants. Thus, for instance, "[s]ince [defendant] Rajen Shah purchased Tomoka, Tennessee Valley and Luminus, these Defendants have submitted a total of 17,448 claims to Medicare Part B and received over $5 million in reimbursement" (id., p. 36, ¶117). In addition, the government sets out the number of claims, with respective amounts, falsely submitted under a referring provider. For instance, "[a]ccording to Medicare Part B claims data, Luminus identified Dr. Bruce Wallstedt as the referring provider for 10 Urine PCR claims and the lab received $3,649.36 in reimbursement" (id., p. 34, ¶109). Thus, the government validly claims that the "[d]efendants knowingly made, used, or caused to be made or used, false records or statements—i.e., the false certifications made or caused to be made by Defendants—material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government" (id., pp. 41–42,

¶144).

Thus, the government has sufficiently alleged that "the defendants knew they had received funds to which they were not entitled and retained the funds instead of returning them." United States v. Biotronik, Inc., 8:18-CV-396-T-36JSS, 2020 WL 1911465 at *7 (M.D. Fla. Apr. 20, 2020) (quoting United States Stepe v. RS Compounding LLC, 325 F.R.D. 699, 709 (M.D. Fla. 2017). Moreover, as indicated, the complaint alleges amounts owed to the government by the defendants. Compare with United States ex rel. Mastej v. Health Management Associates, Inc., 869 F. Supp. 2d 1336, 1347 (M.D. Fla. 2012).

D. Count IV: Conspiracy 31 U.S.C. § 3729(a)(1)(C).

In the final count under the FCA, the government asserts that defendants United Diagnostics and Luminus conspired to defraud the government in violation of section 3729(a)(1)(C) of the FCA (Doc. 24, p. 42, ¶147). To state a claim under the FCA for conspiracy pursuant to 3729(a)(1)(C), the government must demonstrate "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered

17

damages as a result of the false or fraudulent claim." <u>Corsello</u> v. <u>Lincare,</u> <u>Inc.</u>, 428 F.3d 1008, 1014 (11th Cir. 2005) (internal citation omitted). Notably, as with other claims under the FCA, the specificity standard pursuant to Rule 9(b) applies.

In its complaint, the government asserts that defendants United Diagnostics and Luminus knowingly conspired with the remaining defendants to defraud the government (Doc. 24, p. 42, ¶147). The declaration of Sean P. Keefe, the attorney of record in this matter, provides evidence for this claim. Mr. Keefe states:

> Count IV of the Complaint asserts a cause of action against Defendants United Diagnostics and Luminus for conspiracy to violate the FCA. (Doc. 24 at ¶¶ 146-8). In August 2020, CMS implemented a payment suspension based on credible allegations of fraud that suspended any payment Tomoka and Tennessee Valley would receive from Medicare Parts A and B. (Id. at ¶¶ 59, 65, and 69). Partly as a result of these suspensions, Defendant Shah formed United Diagnostics in October 2020 and named his spouse and children as owners. (Id. at ¶ 69; *see also* Doc. 26 at ¶ 96). Shah is United Diagnostics' managing partner and oversees the company's operations, sales, and marketing and receives compensation from United Diagnostics. (Doc. 24 at ¶ 13).
>
> Starting in October 2020, United Diagnostics served as the management company for Luminus.

18

> Based on a review of the claims data, it appears that after Tomoka and Tennessee Valley were suspended, Shah shifted their billings to Luminus. (Doc. 26 at ¶¶ 91-3). Fraudulent proceeds from Luminus' Urine PCR claims were then transferred from Luminus to United Diagnostics. (Id. at ¶ 113). Accordingly, Defendants United and Luminus conspired to violate the FCA.

(Doc. 68, pp. 5–6).

> Mr. Keefe adds (id., p. 8):

> As noted above, starting in October 2020, United Diagnostics served as the management company for Luminus. From November 1, 2020 through the present, Luminus submitted 9,051 Urine PCR claims and received $2,654,747.13 in Part B reimbursement. At least half of these claims are false, resulting in a single damages amount of $1,327,373 from 4,526 false Urine PCR claims.

> Accordingly, for Counts I through IV, United Diagnostics is jointly and severally liable for $3,982,119 in treble damages plus civil monetary penalties of $50,605,206 ($11,181 for each of the 4,526 false claims) for a total of $54,587,325.

Thus, the government asserts that United Diagnostics and Luminus are culpable since their actions were driven by defendant Shah either as manager or owner. The complaint clearly shows that defendant Shah was the architect of the fraudulent scheme. Moreover, there has been

no attempt by either Luminus or United Diagnostics to show that they are not part of the conspiracy to commit fraud and therefore should not be held accountable.

As indicated, the government asserts common law claims of unjust enrichment and payment by mistake. Given that judgment should be entered on its FCA claims, these claims need not be considered. Thus, considering liability on these equitable claims would be nothing more than an academic exercise, since "any recovery under them would be duplicative" and, therefore, impermissible. United States ex rel. Drummond v. BestCare Laboratory Services, L.L.C., 950 F.3d 277, 284 (5th Cir. 2020) (citing United States ex rel. Miller v. Bill Harbert Intern. Const., Inc., 505 F. Supp. 2d 20, 24 (D.D.C. 2007)); United States ex rel. ex rel. Cairns v. D.S. Med. LLC, 42 F.4th 828, 832 (8th Cir. 2022) (same). Notably, the government acknowledges that it only seeks damages on its FCA claims and merely pled the common law claims as "alternative theories of recovery" (Doc. 73, p. 2).

## IV.

Once a defendant is found to have violated the FCA, it "is liable to the United States Government for . . . [three] times the amount of damages

which the Government sustains because of the act of that person," plus civil penalties. 31 U.S.C. § 3729(a). "FCA damages 'typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it.'" U.S. v. FastTrain II Corp., 12-CIV-21431, 2017 WL 606346 at *9 (S.D. Fla. Feb. 15, 2017) (quoting United States ex rel. Doe v. DeGregorio, 510 F. Supp. 2d 877, 890 (M.D. Fla. 2007) (internal citation omitted). Though there is no set formula for determining actual damages, the Eleventh Circuit has held that the proper measure of damages is "'the difference between what the government actually paid on the fraudulent claim and what it would have paid had" it known of the false statements. United States v. Killough, 848 F.2d 1523, 1532 (11th Cir. 1988). Thus, as the Eleventh Court recently noted, "in the context of Medicare claims . . . courts have measured damages as the difference between what the government paid and what it would have paid had the defendant's claim been truthful and accurate." Yates v. Pinellas Hematology & Oncology, P.A., 21 F.4th 1288, 1304 (11th Cir. 2021).

Additionally, there are civil penalties for those found liable under the FCA. 31 U.S.C. § 3729(a). Thus, a defendant "is liable to the United States Government for a civil penalty of not less than $[5,500.00] and

21

not more than $[11,000.00].” 28 C.F.R. § 85.3(a)(9).[2] For violations

occurring after November 2, 2015, such as here, the civil penalty range has

been increased to a minimum of $11,181.00 and a maximum of $22,363.00

per violation. See 258 C.F.R. § 85.5. The civil penalty is assessed for each

false claim made. 31 U.S.C. § 3729(a)(2).

      In this type of situation, where the government would have paid

nothing to the defendants for their false claims, the proper measure of

damages is the full amount the government paid out. Yates v. Pinellas

Hematology & Oncology, P.A., supra, 21 F.4th at 1304 (noting that “the jury

could have found that the United States would have paid nothing had [the

defendant’s] claims been truthful and accurate”); United States v. FastTrain

II Corp., supra, 2017 WL 606346 at *9 (citing United States v. Anghaie, 633

Fed. Appx. 514, 516 (11th Cir. 2015).

      The government states that defendant Shah, through his

defendant companies, has submitted “15,677 Urine PCR claims during the

---

[2] In 2015, Congress passed the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, which required federal agencies to adjust civil payments to account for inflation. See Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified at 28 U.S.C. § 2461); see also Yates v. Pinellas Hematology & Oncology, P.A., 21 F.4th 1288, 1315 (11th Cir. 2021). Thus, the civil penalty was increased to not less than $5,500 and not more than $11,000 per violation. 28 C.F.R. § 85.3(a)(9).

relevant time period and received $4,928,501.38. As pled in the Complaint, the United States estimates at least half of these claims are false" (Doc. 67, p. 20). Thus, the government seeks the following damages for each of the defendants:

For defendant Shah, the government seeks damages of $105,634,097.50, which is comprised of three times the amount of damages proved for false claims to Medicare in the amount of $8,079,872.50, plus civil penalties of $11,181.00 for each of the 8,725 false claims in the amount of $97,554,225.00 (Doc. 67, p. 20; Doc. 68, p. 7).

For defendant Tomoka, the government seeks damages of $6,159,118.00, which is comprised of three times the amount of damages proved for false claims to Medicare, during the relevant time period, in the amount of $154,921.00, plus civil penalties of $11,181.00 for each of the 537 false claims in the amount of $6,004,197.00 (Doc. 67, p. 21; Doc. 68, p. 6).

For defendant Tennessee Valley, the government seeks damages of $23,996,305.50, which is comprised of three times the amount of damages proved for false claims to Medicare, during the relevant time period, in the amount of $2,461,699.50, plus civil penalties of $11,181.00

for each of the 1,926 false claims in the amount of $21,534,606.00 (id.).

For defendant Luminus, the government seeks damages of $75,478,674.00, which is comprised of three times the amount of damages proved for false claims to Medicare, during the relevant time period, in the amount of $5,463,252.00, plus civil penalties of $11,181.00 for each of the 6,262 false claims in the amount of $70,015,422.00 (id.).

For defendant Golden Rule, the government seeks damages of $105,634,097.50, which is comprised of three times the amount of damages proved for false claims to Medicare in the amount of $8,079,872.50, plus civil penalties of $11,181.00 for each of the 8,725 false claims in the amount of $97,554,225.00 (Doc. 67, p. 21; Doc. 68, p. 8).

Finally, for defendant United Diagnostics, the government seeks damages of $54,587,325.00, which is comprised of three times the amount of damages proved for false claims to Medicare from November 1, 2020 (after its formation in October 2020) through the present, in the amount of $3,982,119.00, plus civil penalties of $11,181.00 for each of the 4,256 false claims in the amount of $50,605,206.00 (Doc. 67, p. 22; Doc. 68, p. 8).

As the government sets forth in its motion and complaint, of the total Medicare claims made by the various defendants, it estimates that "at

least half" of those claims were false. The government made its assessment for each defendant accordingly, an assessment that I find is a reasonable estimate of the government's loss. U.S. v. FastTrain II Corp., supra, 2017 WL 606346 at *9 ("The computation of damages does not have to be done with mathematical precision but, rather, may be based upon a reasonable estimate of the loss."). While the amount of damages in this matter is substantial, the Eleventh Circuit has "explained that when the United States is defrauded, 'the government has been damaged to the extent that such corruption causes a diminution of the public's confidence in the government.'" Yates v. Pinellas Hematology & Oncology, P.A., supra, 21 F.4th at 1316 (citing United States v. Killough, supra, 848 F.2d at 1533. Moreover, the Eleventh Circuit has noted that damages pursuant to the FCA are meant, at least in part, to act as a deterrent. Id. Thus, the Eleventh Circuit has approved damages that were noted as "'very harsh,'" in a matter where "the size of the award [was] a direct reflection of [the defendant's] repeated and knowing submission of false claims to the United States." Id. Similarly, defendant Shah repeatedly and knowingly made false claims despite the warning of several practitioners. Therefore, I recommend that the requested treble damages be assessed against the defendants.

Moreover, I find that the requested civil penalties are reasonable. As indicated, the government requests a fine of $11,181.00 per false claim be imposed. That amount is the minimum amount in the civil penalty range. See 258 C.F.R. § 85.5. "[W]here—as here—the statutory minimum penalty is imposed, the district court lacks the authority to go below that minimum absent a constitutional violation. In other words, standards do not come into play if the court is imposing only the statutory minimum penalty mandated by Congress." Yates v. Pinellas Hematology & Oncology, P.A., 21 F.4th 1288, 1316, n.9 (11th Cir. 2021). Therefore, I recommend that the requested civil penalties be assessed against the defendants.

## V.

For the foregoing reasons, I recommend that default judgment be entered against the defendants for violations of the FCA as discussed. Further, I recommend that the plaintiff be awarded damages in the following amounts:

1. For defendant Rajen Shah, $105,634,097.50.

2. For defendant Tomoka Medical Lab, Inc., $6,159,118.00.

3. For defendant Tennessee Valley Regional Laboratories, LLC,

26

$23,996,305.50.

4. For defendant Luminus Diagnostics, LLC, $75,478,674.00.

5. For defendant Golden Rule Management, LLC, $105,634,097.50.

6. For defendant United Diagnostics Lab, LLC, $54,587,325.00.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: August 23, 2023.

## NOTICE TO PARTIES

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.   28 U.S.C. 636(b)(1)(C).   Under 28 U.S.C. 636(b)(1), a party's failure to object to this report's proposed findings and recommendations waives that party's right to challenge on appeal the district court's order adopting this report's unobjected-to factual findings and legal conclusions.